Mayson *v.* Beazley.

## C. C. MAYSON's Administrator, *v.* JAMES F. BEAZLEY's Administrator.

Where the books kept both by a partnership and the survivor after the death of one of the firm, are offered in evidence, and it is proven that they were regularly kept during both periods by the same bookkeeper, and another person was regularly employed by the copartners to measure and sell the articles, to hire hands, receive and pay out money, keep an account thereof, and report the same to the bookkeeper for entry in the copartnership books, and that person made his report once a week to the bookkeeper, and as a witness testified, that he had further examined the books and believed them to have been regularly and correctly kept; the books being used in the settlements of accounts due the copartnership, and the bookkeeper being dead, and his handwriting being proved, with other corroborating evidence: — *Held*, that the books having been lost, as the proof shows, an abstract of the contents of the books, fully and fairly made out by the solicitor of one of the parties litigating, is admissible as secondary evidence to prove the contents of the books.

All debts contracted in the name of a firm are to be regarded as partnership debts until the contrary shall appear, and the fact that debts have matured after the death of one of the members of a firm, and the evidences of the

Mayson v. Beazley.

indebtedness being in the possession of the surviving partner, will be sufficient to create a presumption of his having paid them.

Where one member of a firm dies; until an account is rendered by the surviving member to the representative of the deceased, or the business closed by a sale of the property, a court of equity will, for certain purposes, regard the copartnership as still in existence; and will require the survivor to account for whatever profits he may have made by the use of the property, or the employment of the joint capital, after deducting all necessary expenses in conducting the business.

Where one member of a firm makes a sale of copartnership property, and at the time takes what is considered good security, which subsequently turns out to be insolvent, he ought not to be held personally liable for any loss occasioned by such insolvency; especially where the other copartner, or his representative, has prevented the prosecution of suits at law, and the recovery of judgments for the property sold.

On appeal from the superior court of chancery; Hon. Stephen Cocke, chancellor.

This was a bill filed in the superior court of chancery by James F. Beazley's administrator, against C. C. Mayson's administrator. The record is very voluminous, and the facts are, in substance, that in the month of April, 1835, C. C. Mayson and James F. Beazley became partners in a saw-mill. James F. Beazley died in September, 1835. Mayson continued to run the mill, pay debts, &c., until the ___ day of February, 1837, when he and the heirs of Beazley sold it to Richards & Washington for $25,000, for which sum four notes of $6,250 each were taken, payable to Mayson as survivor, &c. Mayson assigned one of the notes to a third person, and payments were made on another by Richards & Washington, lifting the partnership debts of Mayson & Beazley, which payments reduced the principal of that note to about $4,000. Mayson died in September, 1837. As soon as the notes were respectively due they were sued on, and judgments obtained, and also a bill filed and decree obtained foreclosing the mortgage made by Richards & Washington to secure said notes. Beazley's administrator then by this bill enjoined Mayson's administrator, and pray for a settlement of the partnership accounts. In taking the account, Mayson's estate is charged with the whole $25,000, for which the mill was sold to Richards & Washing-

ton. So charging him, the balance found in favor of Beazley's estate is $11,000. Whereupon the court decreed that the mortgage property be sold, and the proceeds, to the extent of $11,000, be paid to Beazley's estate. .And the court further decrees, that if the mortgaged property will not bring said sum of $11,000 and interest, that the administrator of Charles C. Mayson pay to Beazley's administrator the deficit, and on failure thereof, that execution issue against Mayson's estate for the balance.

The administrator of Mayson prayed an appeal to this court.

*D. Shelton*, for appellant,

Filed an elaborate written argument, reviewing the facts of the case at great length.

*Dixon* and *Potter*, for appellee,

In reply, filed lengthy arguments.

Mr. Justice FISHER delivered the opinion of the court.

This was a bill filed in the superior court of chancery, by the administrator of a deceased partner against the administrators of the surviving partner for an account touching as well the copartnership transactions, as the profits alleged to have been made by the survivor, who continued in the use and management of the joint property for a certain period of time after the dissolution of the concern.

The facts, so far as it is necessary to state them, are briefly as follows. C. C. Mayson, whose representatives are sued, and James F. Beazley, the complainant's intestate, about the first of May, 1835, formed a copartnership to purchase a steam saw and grist-mill, and certain other property connected therewith in the vicinity of Jackson. About the 28th of September following, Beazley died. Mayson continued to carry on the business and manage the property till about the month of February, 1837, when the property was sold to Richards & Washington for the sum of $25,000, payable in six, twelve, eighteen, and twenty-four months from date.

The bill alleges that during the period of Mayson's management of the property, large profits were made, for which he

failed to account to the complainant, as administrator of Beazley.

The case having been referred to a master to take an account of the copartnership transactions, of the profits made by Mayson after the dissolution of the copartnership by the death of Beazley, and of the amount of the sale to Richards and Washington, the master reported the share of each partner to be $11,803.31, for which sum the chancellor rendered a decree in favor of the complainant, directing first a sale of the property under the mortgage given by Richards and Washington to secure the purchase-money; and that for any balance after such sale, execution might issue against Mayson's estate.

The master in taking the account, charges Mayson with what he says were the gross receipts on account of the mills, from the commencement of the copartnership to the date of the sale in February, 1837, being the sum of $44,960, and making an average of eighty dollars per day.

To this charge the counsel for the appellant filed an exception, on the ground that the estimate was not sustained by either the evidence regularly taken in the cause, or by that introduced before the master. This exception, as well as all the others taken to the report, was disallowed by the master, and his action sustained by the chancellor.

The exceptions may, in general terms, be said to relate to three matters, to wit:—

First, The charge of $80 per day as the general average product of the mills.

Secondly, Not giving Mayson the credits to which it is alleged he was entitled for debts which he paid against the copartnership, and for certain property which it is said he put into the concern; and,

Thirdly, Not giving him credit for the expenses necessarily incurred in carrying on the business.

The first exception, the charge of $80 per day, may be said to depend entirely for its validity upon the weight of evidence. Many of the witnesses speak of the mill cutting from three to five thousand feet of lumber per day, and that the lumber was usually sold at $40 per thousand feet. This evidence, if be-

lieved, would, of course, not only sustain the estimate of the master, but would have authorized, if not required, a much higher charge. Opposed to this testimony is the evidence furnished by what the appellant's counsel insists were the books kept by both the copartnership and by Mayson, while conducting the business. These books were filed by the defendants below, as exhibits to their answer; but were lost or mislaid before the account was taken. Before the loss, the solicitor of the complainant, made what he says was intended to be a full and complete abstract of the contents of the books, to aid him in the management of the cause. During the investigation before the master, the adverse counsel insisted, after establishing the loss of the books, that this abstract should be introduced as secondary evidence. The complainant's counsel objected to giving up or furnishing as evidence, his private memorandums. The master overruled the objection, and required the counsel to produce the abstract, which was accordingly done. The solicitor being introduced as a witness, stated that he intended it at the time as a full and fair representation of every matter appearing upon the books.

Supposing, then, the books to be competent evidence, and this abstract to have established their contents, the controversy is at once settled as to this exception, the evidence showing that the mill did not average exceeding sixty dollars' worth of lumber per day, during the twenty-one months it was kept in operation. It is admitted that the books were admissible in evidence for the purpose of proving the copartnership transactions, but not for the purpose of proving the transactions of Mayson after Beazley's death, as a party cannot make evidence for himself.

It is absurd to suppose that so extensive a business, consisting of a variety of small transactions, could be conducted without books. It is equally absurd to suppose that a man in such a multiplicity of transactions, could produce direct or positive testimony to establish the correctness of every entry made in the course of business. The question under such circumstances, is not whether the books are evidence, but whether they have been sufficiently proved to admit them as evidence.

It is proved that they were the books kept by both the partnership and by the survivor. They were kept during both periods by the same bookkeeper. He is proved to have been a regular bookkeeper. Another witness, Bedford, proves that he was employed by the copartners, "to measure and sell the lumber, to hire hands, receive and pay out money, to keep accounts thereof, and report the same to James Pattison, for entry in the copartnership books;" that he made his reports once a week to Pattison; that he had examined the books kept by Pattison, and believed them to have been regularly and correctly kept; "that the books were used in the settlement of all the accounts for lumber or other products of the mills." It was further proved, that Pattison, the bookkeeper, is dead, and that the books are in his handwriting. Accompanied by this and other corroborating evidence, we feel no hesitation in declaring that the books were not only competent, but the best evidence the nature of the case would admit of; and that a sufficient ground having been established for the introduction of secondary evidence, the abstract, as proved by the complainant's solicitor, was properly admitted, to prove their contents.

It requires no argument to show that most of the witnesses, whose statements differ from this testimony, had no means of acquiring accurate information as to the quantity of lumber sawed, for the period of time comprehended by the investigation. The mill may have been capable of accomplishing what they said it did. It may have occasionally come up to their estimates; but what it was capable of doing, and what it may have occasionally done, are very different propositions from what was actually done for twenty-one months in succession.

Looking through the whole evidence, we are of opinion that the exception was well taken, and ought to have been sustained.

In regard to the other exceptions, they may be disposed of in general terms. Mayson was unquestionably entitled to credit for all debts which he paid, contracted by the copartnership. All debts contracted in the name of the firm must be regarded, unless the contrary shall be made to appear, as copartnership debts. The fact that they matured after the death of Beazley, and Mayson having possession of the evidences of debt, will be

sufficient to create a presumption of his having paid them. He is also entitled to credit for all moneys necessarily paid for the recovery, protection, or safe-keeping of the copartnership property, and hence entitled to credit for the money paid for the capture, &c. of the runaway slave in Georgia.

He is entitled to credit for all expenses incurred in conducting the business, and if the boiler, for the costs and expenses of which he claims a credit, were necessary to continue the machinery in successful operation, he is entitled to credit for it as part of the regular expenses. He is entitled under any circumstances to a credit to the extent that it enhanced the value of the property in the sale to Richards and Washington.

As to the credit claimed by the appellant for the insolvent and uncollected debts, this question may be disposed of by settling the principle upon which Mayson would be held accountable for the profits made after the death of his partner.

By the death of Beazley the partnership was dissolved. The legal title to the property survived to Mayson only for the purpose of enabling him to pay the copartnership debts. As to the beneficial interest in the property, Mayson and Beazley's representative were tenants in common. It was the right of the representative of the deceased partner to call for an account at any time, and Mayson's duty to give it when demanded. Till the account was given, or the business closed by a sale of the property, a court of equity will, for certain purposes, regard the partnership as still in existence, and will require the survivor to account for whatever profits he may have made by the use of the property or the employment of the joint capital. Or, to state the proposition in a few words, if the survivor has made profits he must account for them upon the terms regulating the copartnership; if he has made nothing by continuing the business, he is accountable only as a tenant in common.

This brings us to the consideration of the question at issue, to wit: What shall be regarded as profits, so far as the rights of the administrator of the deceased partner may be considered? This question is easily answered. The complainant can only ask to share equally the profits which Mayson realized, and hence whatever was not a profit in the hands of Mayson,

cannot be claimed as such by the complainant. He cannot claim that Mayson shall be answerable in money for that which had only a nominal value, and was in no just sense money or its equivalent in his hands. The complainant's right to any particular or definite sum of money must be based upon the fact that Mayson has or will receive a like sum, as part of the profits resulting from the enterprise. It is scarcely necessary, therefore, to state that Mayson's estate is entitled to credit for the insolvent and uncollected debts. He could only be required to account for the profits which he actually made, and not for what it was possible for him to have made under a more judicious system of business.

Many of these debts may ultimately be collected; if so, they will then be profits, to a moiety of which the complainant will be entitled. The question now to be determined is, whether they shall be treated as money in taking the account, and the complainant be decreed his share to be paid in money, and Mayson's estate to take his share in these debts. Such a course of proceeding would be a gross departure from the rule under which the complainant is allowed to assert his claim, that equality is equity. By interposing his claim for the profits, he tacitly assents to Mayson's contracts and manner of transacting the business; and he can only ask to come in upon the terms of equality with Mayson as to the benefits which the latter would reap from his acts.

The last point which we will notice is, the alleged error in the final decree awarding execution against Mayson's estate.

It will be borne in mind, that whatever profits were made from the use of the property, were consumed in paying the copartnership debts. There was, therefore, nothing to divide between the copartners but the money arising from the sale to Richards & Washington. In making this sale Mayson took what was at the time considered by all parties as good security, and he ought not, therefore, to be held personally liable for any loss occasioned by the subsequent insolvency of the securities, especially under the circumstances of this case, where the complainant prevented the prosecution of suits at law and the recovery of judgments.

10 *

The complainant, however, will be entitled to prior satisfaction out of the money arising from the sale under the mortgage, to the amount of money received by Mayson on account of his share of the notes of Richards and Washington.

The facts are too numerous and complicated to be noticed in detail. We have, therefore, noticed only such as relate to the main points in controversy. The same may be said as to the various questions of law as applicable to the facts. These several matters can be more clearly presented in the decree which will be entered in this court, as they are only important in the settlement of this controversy.

Decree reversed, and cause remanded.