### PULFORD v. UNITED STATES.
### No. 10036.

Circuit Court of Appeals, Sixth Circuit.
June 24, 1946.

Walter E. Kelly, of Detroit, Mich. (George A. Kelly and Walter E. Kelly, both of Detroit, Mich., on the brief), for appellant.

A. Stewart Kerr and Thomas P. Thornton, both of Detroit, Mich. (John C. Lehr, Thomas P. Thornton and A. Stewart Kerr, all of Detroit, Mich., Bernard J. Vincent, of Washington, D. C., and Franklin C. Knock, of Detroit, Mich., on the brief), for appellee.

Before SIMONS, ALLEN, and MILLER, Circuit Judges.

SIMONS, Circuit Judge.

The appellant was convicted on two counts of an indictment, the first charging him with conspiring to commit offenses against the United States in violation of Title U.S.C.A., 50 Appendix, § 1191, the Renegotiation Act, the second with furnishing a false financial statement to the Secretary of War and the Price Adjustment Section in connection with costs incurred by the Affiliated Engineering Company, in violation of the same section. His principal contention on appeal is that at the trial the court permitted the introduction of excerpts from his evidence which, in violation of his constitutional right to immunity, he was compelled to give to the Grand Jury.

The Affiliated Engineering Company was an enterprise located in Detroit, designing tools, jigs, dies and the like, used by prime contractors with the government for the manufacture of machinery and other products used in the prosecution of the war. One Andrew Kalman was either its sole owner or a partner in its ownership. Upon contracts with the United States the company had, during 1942, sales in excess of $100,000, and so was subject to the provisions of the Renegotiation Act which became effective April 28, 1942, the renegotiation period extending from that date until December 31. The appellant is a certified public accountant and was employed by Affiliated before, during and subsequent to the renegotiation period. Negotiations initiated by the government terminated in an agreement in January, 1944. On September 28, 1944, the appellant was summoned by subpoena to appear before the Grand Jury relative to certain transactions of Affiliated Engineering Company. A month later he and Kalman were indicted, but the appellant alone stood trial. We are advised that Kalman pleaded guilty.

The contention of the appellant that his constitutional exemption against self-incrimination, preserved to him by the Fifth Amendment, was violated, grows out of a colloquy which took place between him and Assistant United States Attorney Thornton and Kerr, a Special Assistant to the Attorney General, when he entered the jury room, the point being raised at the trial by a motion to quash the indictment and discharge the defendant, which was overruled. The colloquy is set forth in full in the margin.[1] It is argued that those

---

[1] "Mr. Kerr: Mr. Pulford, the Grand Jury is investigating certain transactions of the Affiliated of which you probably have some personal knowledge, and as customary in such instances, I offer you a waiver of immunity. If you will, read

in charge of the Grand Jury investigation by the observations made therein, withheld from the appellant a full understanding of his rights; that the explanation they offered of his immunity from self-incrimination was unintelligible; that they erroneously informed him that his testimony was to be confined to public records when in fact the records upon which he was later questioned were the private records of the Affiliated Engineering Company then in possession of the Grand Jury under a cloak of secrecy; that the statements of the investigators were bewildering and grossly misleading; that the defendant was by them confused and deceived as to the extent and purport of the waiver and so could not do an intelligent and voluntary act in respect to it.

It will be observed, however, upon consideration of the colloquy, that the appellant was mainly concerned as to whether his evidence would violate some rule of privilege in respect to confidential infor-

---

that over and tell me whether you understand it. In a word, it simply means you are in to testify so far as you know you have done nothing wrong whatever, and what you tell, you tell freely and waive any rights of incrimination against yourself. Is that the gist of it as you get it? A. Well, the line of business I am in, suppose my client files a complaint against me before the Michigan Association of Certified Public Accountants, and asks for a revocation of my license if I testify to those facts?

"Mr. Thornton: Maybe we can clear that up through the State Board. A. If I divulge some information I have obtained confidentially and he goes to my Michigan Board of Accountancy and says, 'Here is an individual I retained and represented me and disclosed personal transactions of which he has knowledge of, and I want his license cancelled.'

"Mr. Thornton: Do you know anything in the ethics of your profession which prohibits you from giving information which might pertain to a crime? A. I can't pertain to anything that is confidential. I don't know about a salesman. I mean normal civil matters.

"Mr. Thornton: Do you want us to get a clarification from the Board? A. Well, I don't know whether the thing has ever been passed upon by the Board or not.

"Mr. Thornton: The attorney for the Board is over in the Dime Bank Building. A. I certainly wouldn't like to have a client go to the Board and ask for cancellation of my license.

"Mr. Kerr: Do you understand that is what is in store for you? A. No, I don't understand that.

"Q. Well, in short, you are going to be asked to testify concerning certain public records of Affiliated, which you know about, presumably. A. Yes.

"Q. They are now public record. A. I am willing to testify to any report I have rendered and anything in it.

"Mr. Kerr: That is entirely what we propose to question you on. Therefore, I ask you if you are willing to sign your waiver on it. A. If the question is 100 percent on records I have rendered as public knowledge, I am willing to testify to those facts.

"Mr. Kerr: Freely and voluntarily? A. Yes.

"Mr. Kerr: Then do you wish to sign this? A. Of course, pending those qualifications.

"Mr. Kerr: You are willing to let the record show it? A. Absolutely. I am perfectly willing to sign it with these qualifications that are there.

"Mr. Kerr: I see. You mean you are willing to sign this, plus what you have stated in the record, which is self-evident? A. That is right.

"Mr. Thornton: Do you fully understand the waiver, Mr. Pulford? A. The waiver is quite broad. In other words, I think, according to this I can't be prosecuted, I believe, if I don't tell the gentlemen the truth?

"Mr. Thornton: No, that is not it. You can be prosecuted, anyway, if you don't tell the truth before any tribunal where you take an oath, but this is anything you give here, any testimony here that may incriminate you. A. I have always hewed to the line in the practice of accountancy one hundred percent, and I don't believe in my past practice there is anything in my past record I would be prosecuted for.

"Mr. Thornton: Well, that is the purpose of that waiver. We want to know if you understand it. A. I believe I do, and under those conditions put in there, I will gladly sign the paper, I think the qualifications are in there.

"(Whereupon, witness signs waiver.)

"A. Now, may I ask the Grand Jury this question: Have you ever had any C. P. A. in here under the same circumstances? Has the same question I asked arisen in any other trial?

"Mr. Kerr: I can't say, I don't know.

"Mr. Thornton: I don't think so."

mation obtained by him as an accountant for the Engineering Company, and whether disclosures without the consent of Kalman, would subject him to a cancellation of license to practice his profession. Apparently satisfied by the offers of the investigators to obtain a clarification of the matter from the Board of Accountants and interpreting that offer as advice that he need fear no discipline by the Board, he declared his willingness to sign the waiver tendered to him.

It is quite true that there is much that is surprisingly inept and unintelligible in the effort of an Assistant United States Attorney and a Special Assistant to the Attorney General to explain the purpose of the waiver, and that at one stage of the interview the appellant was, or professed to be under an impression that he could not be prosecuted if he failed to testify to the truth. That misunderstanding was, however, resolved by Thornton's warning to him that if he testified falsely he might be prosecuted. The appellant's reference to qualifications in the document tendered to him, is likewise unintelligible, but it would seem to refer to an understanding that if he signed the waiver and gave evidence he would be in no trouble with the Board of Accountants.

■ However confusing the colloquy may be, one aspect of it stands out quite clearly. By no word or phrase did the appellant indicate that he was averse to giving evidence on the ground that it would incriminate him. On the contrary, he repeatedly insisted that he had always hewed to the line in the practice of accountancy, and that there was nothing in his past record for which he could be prosecuted. Nor was there deceit by the investigators as to the character of the records concerning which he was to be interrogated. Section 1191(c) (5) (A) of Title 50 requires that every contractor who holds contracts to which the provisions of the subsection are applicable, file with the Board a financial statement setting forth such information as the Board may, by regulations, prescribe, and that the contractor shall furnish the Board any information, records or data which the Board may deter-

mine to be necessary to carry out the mandate of the section. Such records were available to the investigators and to the Grand Jury. They were therefore not the private records of the Engineering Company but were public records, or records at least of a semi-public character, which, like records of corporations, the production of which may be compelled, are not inviolable. United States v. Austin-Bagley Corporation, 2 Cir., 31 F.2d 229, 233, 234; Heike v. United States, 227 U.S. 131, 33 S.Ct. 226, 57 L.Ed. 450. Of such records Judge Learned Hand, in the Austin-Bagley case, interpreting Heike v. United States, said, "Hence it appears to us that the case determines that testimony auxiliary to the production is as unprivileged as are the documents themselves." [31 F.2d 234.]

■ Had the appellant explicitly claimed immunity on the ground of self-incrimination, it is doubtful that it would have been of any avail. Not only is there no privilege on the part of an agent or employee of a corporation to refuse to disclose matter which the governing statutes require him to record or report, Essgee Co. of China v. United States, 262 U.S. 151, 43 S. Ct. 514, 67 L.Ed. 917; United States v. Austin-Bagley Corporation, supra; Morgan, The Law of Evidence, LIX Harvard Law Review No. 4,526; but this doctrine has been extended to voluntary associations, United States v. White, 322 U.S. 694, 64 S.Ct. 1248, 1252, 88 L.Ed. 1542, 152 A. L.R. 1202, and the historic function of the privilege is there declared to be that of "protecting only the natural individual from compulsory incrimination through his own testimony or personal records," and "the papers and effects which the privilege protects must be the private property of the person claiming the privilege or at least in his possession in a purely personal capacity."

■ The written waiver of immunity offered to the appellant to sign was undoubtedly tendered to him in an excess of caution. There was no obligation on the part of the investigators to warn him of his constitutional right to remain silent prior to his examination before the Grand

Jury. Wilson v. United States, 162 U.S. 613, 16 S.Ct. 895, 40 L.Ed. 1090; Powers v. United States, 223 U.S. 303, 313, 32 S.Ct. 281, 56 L.Ed. 448; United States v. Hirsch, 2 Cir., 74 F.2d 215, 219; O'Connell v. United States, 2 Cir., 40 F.2d 201; Mattes v. United States, 3 Cir., 79 F.2d 127, 128. This much the appellant concedes. He claims, however, that under the facts and circumstances disclosed by the record, the waiver was obtained without understanding of its purport, and that his confusion was caused by the misleading explanations of the investigators, in consequence of which his testimony was not given voluntarily.

■ The waiver, however, speaks for itself and is set forth in full in the margin.[2] It is in clear and understandable language, recites that the signatory does not have to testify before the Grand Jury; that the government cannot compel him to testify and that if he does his testimony may be used against him in any criminal prosecution that may result from action of the Grand Jury; that he waives immunity and voluntarily offers to answer all questions without threats or promises having been made to him. However confusing the attempted explanation of its purport by the investigators, there is nothing confusing or unintelligible in the waiver which the appellant said he understood and would gladly sign. The appellant was not a man of low intelligence, ignorant of the language or with limited experience. He was born in Hamilton, Ontario, Canada, was a high school graduate and had attended the McCallum Business Institute at Windsor, Ontario. He was 39 years old, had resided in the United States since he was 19 and had been employed for various periods as bookkeeper, cost clerk and general accountant by many large corporations; had passed a State Board examination in 1938 and been licensed by the state as a Certified Public Accountant. He was a witness in his own behalf at the trial. To have concluded that his testimony before the Grand Jury was involuntary and given in ignorance of his constitutional right to remain silent, was altogether too great a strain upon credulity. The court was not in error in receiving the minutes of the Grand Jury and in refusing to quash the indictment.

In arriving at this conclusion we give no weight to the contention that the appellant's evidence before the Grand Jury was not incriminating, and have given scant consideration to its import. The fact that it was introduced at the trial is enough to warrant the assumption that it bore upon guilt or that so the prosecutors thought. If it did not have that aspect it had no place in the case. It will not do to say that it became admissible to test the appellant's credibility. If he had, under oath, repudiated the statements made to the Grand Jury, such repudiation could have been made the basis of an indictment for perjury.

■ Remaining claims of error require little consideration. The appellant is aggrieved at testimony relating to the income tax returns of Kalman and his sister for

---

2 "Waiver of Immunity

'I, Ross B. Pulford, having been advised of my constitutional rights by Thomas P. Thornton, Assistant United States Attorney for the Eastern District of Michigan, in that I do not have to testify before the Grand Jury, that the Government cannot compel me to so testify, and that if I do so testify my testimony may be used against me in any criminal prosecution that may result from action of the Grand Jury, do hereby waive any and all immunity granted me by law from testifying before the Grand Jury and of my own free will, without any threats or promises of gain or favor, hereby voluntarily offer to answer any and all questions that may be put to me by members of said Grand Jury, the Assistant United States Attorney or the Special Attorneys in charge of said Grand Jury relating to any violations of law which I am now charged or may be charged, knowing the same may be used against me and that the Grand Jury may return an indictment against me on account of such testimony.

"(s) Ross B. Pulford

"(s) Thomas P. Thornton
"Witness

"(s) Bernard J. Vincent
"Witness

"(s) A. Stewart Kerr
"Witness

"Dated this 28th day of September, 1944."

the year 1941, prepared by him and lying outside the renegotiation period. The charge, however, was that Kalman's costs on government contracts were padded by the inclusion of items not reflecting legitimate cost of production. The books showed a credit to Mary Kalman of $15,000 at the close of business in 1941, substantial increases in her salary, various other transactions with her, and the claim that she had been admitted into partnership with Kalman. All of these matters bore upon the question whether Kalman had made excess profits on government operations. They should have been subjected to most rigid scrutiny. Nor is there merit in the contention that the court erred in permitting an examination of the defendant with reference to rules governing professional conduct of the Michigan State Board of Accounting. They were invoked by the appellant as the only ground for hesitation in waiving immunity. It was pertinent to inquire concerning them to determine whether his hesitancy in signing the waiver was or was not evidence of good faith. In any event, we fail to sense prejudice to the defendant in the admission of the evidence. Other claims of error were not pressed in briefs or argument, and according to familiar practice we do not consider them.

Affirmed.