## CURCIO *v.* UNITED STATES.

No. 260.   Argued March 28, 1957.—Decided June 10, 1957.

*Samuel Mezansky* argued the cause for petitioner. With him on the brief was *Daniel H. Greenberg.*

*Beatrice Rosenberg* argued the cause for the United States.   With her on the brief were *Solicitor General Rankin, Assistant Attorney General Olney* and *Carl H. Imlay.*

MR. JUSTICE BURTON delivered the opinion of the Court.

The issue in this case is whether the custodian of a union's books and records may, on the ground of his Fifth Amendment privilege against self-incrimination, refuse to

answer questions asked by a federal grand jury as to the whereabouts of such books and records which he has not produced pursuant to subpoena. For the reasons hereafter stated, we hold that the privilege against self-incrimination attaches to such questions.

In April 1956, a special grand jury in the United States District Court for the Southern District of New York was investigating racketeering in the garment and trucking industries in New York City. This investigation followed widespread charges of racketeering in labor unions, including specific charges that seven local unions had been recently chartered by a faction of the International Brotherhood of Teamsters to gain control of the Teamsters' New York Joint Council, and that these "phantom unions" were controlled by a group of gangsters, ex-convicts and labor racketeers.

Petitioner, Joseph Curcio, the secretary-treasurer of Local 269 of the International Brotherhood of Teamsters, one of the alleged "phantom unions," was subpoenaed to appear before the grand jury, and to produce the union's books and records. There were two subpoenas—a personal subpoena *ad testificandum* and a subpoena *duces tecum* addressed to him in his capacity as secretary-treasurer of Local 269. On several days he appeared before the grand jury but failed to produce the demanded books and records. He testified that he was the secretary-treasurer of Local 269; that the union had books and records; but that they were not then in his possession. He refused, on the ground of self-incrimination, to answer any questions pertaining to the whereabouts, or who had possession, of the books and records he had been ordered to produce.

The District Court, after a hearing in which petitioner attempted to justify his claim of privilege, directed petitioner to answer 15 questions pertaining to the where-

abouts of the books and records.[1]   It ruled that petitioner's claim of privilege was improper because he had not made a sufficient showing that his answers might

[1] The questions were as follows:

"I am going to ask you certain questions, including some that were put to you on Thursday, which you declined to answer.   Referring to the books and records of Local 269 of the International Brotherhood of Teamsters, have you at any time been in custody of those books and records? . . . .

"Mr. Curcio, have you ever had possession of the books and records of this local? . . . .

"Did you have custody and control of these records last Thursday? . . . .

"Do you have possession of those records or any of them today? . . . .

"Do you have custody and control of any of those records today? . . . .

"Where are any of those records today, if you know? . . . .

"Who has any of those records today, if you know? . . . .

"Where were any of these records or all of these records a week ago Thursday? . . . .

"Where were any or all of these records a week ago Saturday? . . . .

"Where were any or all of these records a week ago last Monday? . . . .

"Where were any or all of these records yesterday? . . . .

"Where are any or all of these records today? . . . .

"Who, if you know, had any or all of these records a week ago last Saturday? . . . .

"Who had any or all of these records a week ago yesterday? . . . .

"Who has any or all of these records today? . . . ."

The above questions were selected by the Government from 225 that were asked petitioner before the grand jury.   He was directed by the foreman of the grand jury to answer these 15, and, upon his refusal to do so under claim of his privilege against self-incrimination, the District Court advised him that it proposed to ask him those questions itself, and that his failure to answer them would constitute contempt of court.   The District Judge thereupon asked petitioner these questions in open court in the presence of the grand jury.   Petitioner refused to answer each of them, and stated that he refused to do so because his answers might tend to incriminate him.

incriminate him. When petitioner persisted in his refusal to answer, the District Court summarily adjudged him guilty of criminal contempt, and sentenced him to six months' confinement unless he sooner purged himself by answering the questions. This conviction related solely to petitioner's failure to answer questions asked pursuant to the personal subpoena *ad testificandum*. He has not been charged with failing to produce the books and records demanded in the subpoena *duces tecum*.

The Court of Appeals affirmed the conviction. 234 F. 2d 470. It held that petitioner had failed to show that his answers to the 15 questions might incriminate him; that the privilege against self-incrimination did not attach to questions put to a custodian relating to the whereabouts of union books; and that petitioner had been accorded a fair hearing. We granted certiorari to determine whether petitioner's claim of privilege was properly denied. 352 U. S. 820.

In the courts below, the Government contended that petitioner had not made a sufficient showing that answering the 15 questions might tend to incriminate him. The Government no longer so contends. In its brief it now says, "We make no claim that, if petitioner's personal privilege did apply to questions concerning the union records, he failed to make an adequate showing of possible incrimination." There is substantial ground for the Government's concession.[2]

---

[2] The grand jury was investigating union racketeering. The newspapers had featured charges that petitioner's union was one of seven "phantom locals" of the International Brotherhood of Teamsters and that it was dominated by gangsters and racketeers. Petitioner conceded that he had a prison record and it was charged that the president of Local 269 was Johnny DioGuardia, allegedly one of the key figures in union racketeering in the New York area. In this context, the questions were incriminating. See 18 U. S. C. §§ 1503 and 1951. "To sustain the privilege, it need only be evident from the implications of the question, in the setting in which it is asked, that a

We turn, therefore, to the remaining issue—whether petitioner's personal privilege against self-incrimination attaches to questions relating to the whereabouts of the union books and records which he did not produce pursuant to subpoena.

It is settled that a corporation is not protected by the constitutional privilege against self-incrimination. A corporate officer may not withhold testimony or documents on the ground that his corporation would be incriminated. *Hale* v. *Henkel,* 201 U. S. 43. Nor may the custodian of corporate books or records withhold them on the ground that he personally might be incriminated by their production. *Wilson* v. *United States,* 221 U. S. 361; *Essgee Co.* v. *United States,* 262 U. S. 151. Even after the dissolution of a corporation and the transfer of its books to individual stockholders, the transferees may not invoke their privilege with respect to the former corporate records. *Grant* v. *United States,* 227 U. S. 74; *Wheeler* v. *United States,* 226 U. S. 478. The foregoing cases stand for the principle that the books and records of corporations cannot be insulated from reasonable demands of governmental authorities by a claim of personal privilege on the part of their custodian.

In *United States* v. *White,* 322 U. S. 694, this principle was applied to an unincorporated association, a labor union. Stating that the privilege against self-incrimination had the historic function of "protecting only the natural individual from compulsory incrimination through his own testimony or personal records" (*id.,* at 701), the Court held that "the papers and effects which

responsive answer to the question or an explanation of why it cannot be answered might be dangerous because injurious disclosure could result." *Hoffman* v. *United States,* 341 U. S. 479, 486–487. See also, *Trock* v. *United States,* 351 U. S. 976; *Emspak* v. *United States,* 349 U. S. 190; *Singleton* v. *United States,* 343 U. S. 944; *Greenberg* v. *United States,* 343 U. S. 918.

the privilege protects must be the private property of the person claiming the privilege, or at least in his possession in a purely personal capacity" (*id.*, at 699).

> "But individuals, when acting as representatives of a collective group, cannot be said to be exercising their personal rights and duties nor to be entitled to their purely personal privileges. Rather they assume the rights, duties and privileges of the artificial entity or association of which they are agents or officers and they are bound by its obligations. In their official capacity, therefore, they have no privilege against self-incrimination. And the official records and documents of the organization that are held by them in a representative rather than in a personal capacity cannot be the subject of the personal privilege against self-incrimination, even though production of the papers might tend to incriminate them personally." *Id.*, at 699.

The Government now contends that the representative duty which required the production of union records in the *White* case requires the giving of oral testimony by the custodian in this case. From the fact that the custodian has no privilege with respect to the union books in his possession, the Government reasons that he also has no privilege with respect to questions seeking to ascertain the whereabouts of books and records which have been subpoenaed but not produced. In other words, when the custodian fails to produce the books, he must, according to the Government, explain or account under oath for their nonproduction, even though to do so may tend to incriminate him.

The Fifth Amendment suggests no such exception. It guarantees that "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ." A custodian, by assuming the duties of his office, under-

takes the obligation to produce the books of which he is custodian in response to a rightful exercise of the State's visitorial powers. But he cannot lawfully be compelled, in the absence of a grant of adequate immunity from prosecution, to condemn himself by his own oral testimony.

In the *Wilson* case, *supra,* which is the leading case for the proposition that corporate officers may not invoke their personal privilege against self-incrimination to prevent the production of corporate records, Mr. Justice Hughes, speaking for the Court, drew the distinction sharply. He said, "They [the custodians of corporate records] may decline to utter upon the witness stand a single self-criminating word. They may demand that any accusation against them individually be established without the aid of their oral testimony or the compulsory production by them of their private papers." 221 U. S., at 385. In the *White* case, *supra,* the Court was careful to point out that "The subpoena duces tecum was directed to the union and demanded the production only of its official documents and records" (322 U. S., at 704), that "He [White, the custodian of the union's records] had not been subpoenaed personally to testify" (*id.,* at 695–696), and that "there was no effort or indicated intention to examine him personally as a witness" (*id.,* at 696). And in *Shapiro* v. *United States,* 335 U. S. 1, 27, holding that the privilege against self-incrimination did not apply to records required to be kept by food licensees under wartime OPA regulations, the Court said, "Of course all *oral* testimony by individuals can properly be compelled only by exchange of immunity for waiver of privilege." There is no hint in these decisions that a custodian of corporate or association books waives his constitutional privilege as to oral testimony by assuming the duties of his office. By accepting custodianship of records he "has voluntarily assumed a duty which overrides his claim of

privilege" *only* with respect to the production of the records themselves. *Wilson* v. *United States,* 221 U. S. 361, 380.

*United States* v. *Austin-Bagley Corp.,* 31 F. 2d 229, and cases following it[3] are relied upon by the Government. Those cases, holding that a corporate officer who has been required by subpoena to produce corporate documents may also be required, by oral testimony, to identify them, are distinguishable and we need not pass on their validity. The custodian's act of producing books or records in response to a subpoena *duces tecum* is itself a representation that the documents produced are those demanded by the subpoena. Requiring the custodian to identify or authenticate the documents for admission in evidence merely makes explicit what is implicit in the production itself. The custodian is subjected to little, if any, further danger of incrimination. However, in the instant case, the Government is seeking to compel the custodian to do more than identify documents already produced. It seeks to compel him to disclose, by his oral testimony, the whereabouts of books and records which he has failed to produce. It even seeks to make the custodian name the persons in whose possession the missing books may be found. Answers to such questions are more than "auxiliary to the production" of unprivileged corporate or association records.[4]

---

[3] *Pulford* v. *United States,* 155 F. 2d 944, 947; *Lumber Products Assn.* v. *United States,* 144 F. 2d 546, 553; *Carolene Products Co.* v. *United States,* 140 F. 2d 61, 66–67; *United States* v. *Illinois Alcohol Co.,* 45 F. 2d 145, 149. See also, *United States* v. *Lay Fish Co.,* 13 F. 2d 136, 137.

[4] The leading case of *United States* v. *Austin-Bagley Corp., supra,* at 233, 234, explains the scope and limitations of this doctrine. In that case, the secretary-treasurer of a corporation, who was charged with conspiracy to violate the National Prohibition Act, was called to the stand by the Government and compelled to identify the

126

The Government cites but one federal case, *United States* v. *Field*, 193 F. 2d 92, as directly supporting its position.[5]  In that case, the trustees of a bail fund were held in contempt for failure to produce records of the fund pursuant to a subpoena.  After affirming the convictions on that ground, the Court of Appeals for the Second Circuit went on to consider, by way of dictum, other contentions raised by the trustees.  One of their contentions was that questions about the location and production of records were improper.  The court, relying on several cases in which a custodian was compelled to identify records which he had already produced, said that the questions pertaining to the location of the records "were

minutes of the corporation.  Circuit Judge Learned Hand, for the Court of Appeals, upheld this procedure, stating:

"That the production of the books and documents could be compelled, even if they contained entries incriminating the accused, is now well-settled law. . . .  However, the availability of the documents does not necessarily determine that of the testimony by which they may be authenticated.  Conceivably it might be possible to force their production, and yet their possessor be protected from proving by his oath that they were what they purport to be. . . .

"While, therefore, we do not disguise the fact that there is here a possible, if tenuous, distinction, we think that the greater includes the less, and that, since the production can be forced, it may be made effective by compelling the producer to declare that the documents are genuine. . . .  Hence it appears to us that the case [*Heike* v. *United States*, 227 U. S. 131] determines that testimony auxiliary to the production is as unprivileged as are the documents themselves.  By accepting the office of custodian the holder not only exposes himself to producing the documents, but to making their use possible without requiring other proof than his own."

[5] The Government also cites *Bleakley* v. *Schlesinger*, 294 N. Y. 312, 62 N. E. 2d 85, holding that a corporation officer who fails to produce corporate records pursuant to a subpoena must give a reasonable explanation or suffer the penalty for nonproduction.  But cf. *Bradley* v. *O'Hare*, 2 App. Div. 2d 436, 156 N. Y. S. 2d 533, where questions put to a union official relating to the whereabouts of union records were held privileged.

proper under the precedents." *Id.*, at 97. The cases cited, however, do not support the court's dictum.[6]

The Government suggests that subpoenaed corporate and association records will be obtained more readily for law-enforcement purposes if their custodian is threatened with summary commitment for contempt in failing to testify as to their whereabouts, rather than with prosecution for disobedience of the subpoena to produce the records themselves. We need not concern ourselves with the relative efficacy of those procedures.[7] There is a great

---

[6] Moreover, prior and subsequent decisions of the same court, in which two of the same judges participated, contradict the statement contained in the *Field* case. In *United States* v. *Daisart Sportswear, Inc.*, 169 F. 2d 856, 861–862, the court stated that "we do not believe that the principle of the Austin-Bagley case, supra, may be projected so that a corporate officer may be compelled to testify as to any and all phases of the corporation's activities, without at the same time obtaining a grant of immunity for the incriminating matter he is compelled to disclose." And further, that "the production of records must be distinguished from oral testimony as to what the records would contain, had they been produced." *Id.*, at 862. Subsequently, in *United States* v. *Patterson*, 219 F. 2d 659, 662, the court, in reversing a contempt conviction for refusal to produce records, approved the trial court's ruling that questions relating to the whereabouts of the records were privileged. "The defendant can here legally be jailed only for a contempt in failing to produce the sought-after books when they are fairly shown to be presently within his power and control. He cannot legally be jailed for contempt for invoking his constitutionally protected privilege not to be a witness against himself."

See also, *Lopiparo* v. *United States*, 216 F. 2d 87, where the trial court upheld the custodian's claim of privilege with respect to oral testimony pertaining to corporate records.

[7] In this case petitioner might have been proceeded against for his failure to produce the records demanded by the subpoena *duces tecum*. See *Nilva* v. *United States*, 352 U. S. 385; *United States* v. *Fleischman*, 339 U. S. 349; *United States* v. *White*, 322 U. S. 694; *Wilson* v. *United States*, 221 U. S. 361.

From a memorandum filed by the Government, it appears that

difference between them. The compulsory production of corporate or association records by their custodian is readily justifiable, even though the custodian protests against it for personal reasons, because he does not own the records and has no legally cognizable interest in them. However, forcing the custodian to testify orally as to the whereabouts of nonproduced records requires him to disclose the contents of his own mind. He might be compelled to convict himself out of his own mouth. That is contrary to the spirit and letter of the Fifth Amendment.

Accordingly, the judgment of the Court of Appeals is reversed and the case is remanded to the District Court with instructions to enter a judgment of acquittal.

*Reversed and remanded.*

---

petitioner later did produce for the grand jury certain books and records of the union when threatened with a commitment for contempt for his failure to comply with a subsequent subpoena *duces tecum* issued to him in his representative capacity. The Government suggested that this subsequent compliance had rendered this proceeding moot, but we believe that it did not do so because the order for petitioner's commitment was for criminal, not civil, contempt.