UNITED STATES of America, Plaintiff-Appellee,

v.

W. F. RENO, a/k/a Bill Reno, Defendant-Appellant.

No. 74–1749.

United States Court of Appeals, Tenth Circuit.

Submitted May 20, 1975.

Decided Aug. 11, 1975.

---

Paul D. Cooper, Denver, Colo., for defendant-appellant.

Daniel J. Sears, Asst. U. S. Atty. (James L. Treece, U. S. Atty., on the brief), Denver, Colo., for plaintiff-appellee.

Before HILL, HOLLOWAY and BARRETT, Circuit Judges.

HILL, Circuit Judge.

Appellant W. F. Reno was indicted by a federal grand jury on six counts of mail fraud, violations of 18 U.S.C. § 1341, and one count of making a false statement in applying for and receiving a loan from a bank whose deposits are insured by the Federal Deposit Insurance Corporation, a violation of 18 U.S.C. § 1014. He was tried before a jury in the United States District Court for the

District of Colorado and he was convicted on all counts. On appeal, he contends that documents and records obtained from him by the grand jury via a subpoena duces tecum violated his Fourth and Fifth Amendment rights under the United States Constitution. We affirm.

The pertinent facts may be summarized as follows. Appellant was the president of, an incorporator-director of, and the majority stockholder in W. F. Reno, Inc., a Colorado corporation. Beginning in March, 1960, W. F. Reno, Inc., operated Bill Reno Pontiac-Rambler in Boulder, Colorado. The dealership maintained a checking account (number 0 0006 8) at the Boulder National Bank. This account was maintained even after the dealership ceased doing business in April, 1969. W. F. Reno, Inc., also operated a National Car Rental franchise in Boulder, Greeley and Estes Park. The franchise was eventually moved to Grand Junction, where it maintained a checking account (number 145 948 6) at the United States Bank of Grand Junction.

From May, 1971, to May, 1972, appellant operated a check-kiting scheme, by use of the mails, on the Boulder National Bank and the United States Bank of Grand Junction. The scheme involved writing checks and simultaneously making deposits on appellant's corporate accounts at the two banks. Checks were drawn against artificial credits created by the deposit of checks in one bank which were drawn against artificial deposits in the other bank. This resulted in a substantial monetary loss to both banks. The United States Bank of Grand Junction discovered the scheme in June, 1972, and notified the United States Postal Service.

On October 5, 1972, the assets of the car franchise were sold. W. F. Reno, Inc., was not dissolved, but it did not conduct any business after that date. Its corporate records were kept in appellant's home for a while and were later placed in storage in Grand Junction.

A postal inspector interviewed appellant on December 21, 1972. He informed appellant that he was conducting a mail fraud investigation as the result of a complaint made by the United States Bank of Grand Junction. He also informed appellant of his constitutional rights. Appellant waived these rights and disclosed that he owned and operated the two businesses in Boulder and Grand Junction; disclosed that he maintained checking accounts at the Boulder National Bank and the United States Bank of Grand Junction; stated that he had the bank statements, checks and deposit slips from both banks stored away; and, admitted conducting the check-kiting operation. Two other interviews were conducted in 1973.

A grand jury was subsequently convened and, on May 24, 1974, a subpoena duces tecum was issued to appellant. It directed him to appear before the grand jury and bring with him:

any and all corporate records for account number 145 948 6 maintained in the name of W. F. Reno, Inc., at the United States Bank of Grand Junction, Grand Junction, Colorado, and/or account number 0 0006 8 maintained in the name of Bill Reno Pontiac-Rambler at Boulder National Bank, Boulder, Colorado; and any and all corporate books and records maintained for W. F. Reno, Inc., including but not limited to books and records for National Car Rental and Bill Reno Pontiac-Rambler, which books are in your care, custody and/or control and which books will reflect any and all corporate financial transactions for W. F. Reno, Inc., National Car Rental, and Bill Reno Pontiac-Rambler from January 1, 1971, to present.

Appellant complied with the subpoena and gave the grand jury the requested records. He was indicted on July 12, 1974, and he thereafter moved (1) to dismiss the indictment on the grounds that it resulted from the grand jury's consideration of evidence illegally seized from him; and (2) to suppress all evidence obtained under color of the grand jury subpoena on the grounds that his Fourth and Fifth Amendment rights had been

violated. Following an evidentiary hearing the trial court denied the motions. Appellant was thereafter tried and convicted.

Appellant first contends that his production of the subpoenaed documents and records provided the government with "links in the chain of evidence needed to convict" and thereby violated his Fifth Amendment privilege against self-incrimination.[1] We disagree.

■ The subpoena duces tecum, although directed to appellant individually, called for the production of " . . . corporate books and records maintained for W. F. Reno, Inc., . . ." The corporate nature of the documents in question is of controlling significance because a corporation is not protected by the constitutional privilege against self-incrimination. A corporate officer may not withhold documents on the ground that his corporation would be incriminated and a custodian of corporate books and records may not withhold them on the ground that he personally might be incriminated by their production. *See, e. g., Curcio v. United States,* 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957). Thus, the privilege is not available to appellant.

■ Appellant, however, asserts that the self-incrimination privilege is nonetheless applicable because he was compelled to do more than merely produce the subpoenaed documents. He argues that the government had no knowledge of the documents and that his production thereof necessarily disclosed their existence and location and also the identity of their custodian. We find no merit in this argument. It ignores the information appellant supplied to the postal inspector during interviews in 1972 and

1973. Under these circumstances we believe that the disclosure of this information was auxiliary to the production of the unprivileged corporate records.

Appellant next contends that the government's use of a subpoena, instead of a search warrant, to obtain evidence amounted to an illegal search and seizure and thereby violated his Fourth Amendment rights.[2] We do not believe a search warrant was necessary.

■ "Historically and of necessity, grand juries have very broad investigative powers through the use of subpoenas duces tecum." *In re Corrado Bros., Inc.,* 367 F.Supp. 1126 (D.Del.1973). *See also Blair v. United States,* 250 U.S. 273, 39 S.Ct. 468, 63 L.Ed. 979 (1919). The reach of a subpoena duces tecum, however, is not without limit. It may, as appellant contends, be so broad and so sweeping that it violates the Fourth Amendment prohibition against unreasonable searches. *See, e. g., Hale v. Henkel,* 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906); *In re Grand Jury Subpoena Duces Tecum, Etc.,* 203 F.Supp. 575 (S.D.N.Y.1967). If a subpoena duces tecum does constitute a violation of the Fourth Amendment courts may quash it.[3] To avoid such judicial action, the subpoena must be reasonable. Although a definitive set of rules to assist in determining reasonableness has not been established, Supreme Court cases suggest three requirements. They are: (1) that the subpoena command only the production of materials relevant to the investigation; (2) that the subpoena specify the materials to be produced with reasonable particularity; and (3) that the subpoena command production of materials covering only a reasonable period of time. *United States v. Gurule,* 437 F.2d 239

---

1. U.S.Const. Amend. V provides, in part: "No person . . . shall be compelled in any criminal case to be a witness against himself . . . ."

2. U.S.Const. Amend. IV provides, in part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ."

3. *See also* Rule 17(c), F.R.Crim.P., which provides that a court may modify a subpoena if compliance would be unreasonable or oppressive.

(10th Cir. 1970), *cert. den'd*, 403 U.S. 904, 91 S.Ct. 2202, 29 L.Ed.2d 679.

The first requirement, that the subpoena command only the production of materials relevant to the investigation, is satisfied by a showing that there is a relation between the documents which must be produced and the purpose of the inquiry. *See, e. g., In re Grand Jury Subpoena Duces Tecum, Etc., supra.* We believe that the government has made such a showing. An assistant United States attorney, during a hearing on appellant's motion to quash the subpoena, stated " . . . that the books and records of this company will reflect on various references that Mr. Reno made on the face of these checks regarding certain car transactions which were supposed to have supported the proceeds of these checks. It is our contention that many of these references are false, and through the corporate books and records evidencing the financial transactions for the corporations it is also our position that we would like to show that the profit and loss position and cash flow position of the corporation show there are no real funds supporting those checks." In short, the records were relevant to show how the check-kiting operation was being obfuscated and maintained by appellant. Thus, we find that the records were relevant to the alleged violations of law which the grand jury was investigating.

The second requirement is that the subpoena specify the material to be produced with reasonable particularity. Here, the subpoena's language exhibited such particularity of description that appellant knew what he was being asked to produce and there also was such particularity of breadth that good-faith compliance with the subpoena would not be unduly burdensome. This requirement has been met.

The final requirement of the reasonableness test, that a subpoena command production of records covering only a reasonable period of time, is also satisfied here. The subpoena, which was issued on May 24, 1974, requested records " . . . from January 1, 1971, to present." This period of time, not in and of itself unduly lengthy, covers only the time during which the check-kiting scheme was in operation or under investigation. As such, it was not unreasonable.[4]

Affirmed.

---

4. One of the issues raised by appellant is whether or not he has standing to raise the search and seizure issue. That point, however, has been conceded by the government.