792 F.2d 1235
 58 A.F.T.R.2d 86-5150, 86-1 USTC P 9451,
20 Fed. R. Evid. Serv. 1344
 UNITED STATES of America and Revenue Officer Elizabeth C.
Camp, Appellees,
v.
Richard LANG, Appellant.
UNITED STATES of America and Revenue Officer Elizabeth C.
Camp, Appellees,
v.
Richard LANG, President, KAL, Inc., and KAL Inc., Appellants.
 Nos. 85-1699(L), 85-1700.
 United States Court of Appeals,
Fourth Circuit.
 Argued Dec. 3, 1985.
Decided June 4, 1986.
 
 David S. Rudolf and Thomas Maher, Beskind and Rudolf, Durham, N.C., for appellant.
 Rudolph A. Renfer, U.S. Atty., Raleigh, N.C., for appellees.
 Before RUSSELL and CHAPMAN, Circuit Judges, and SWYGERT, Senior Circuit Judge of the United States Court of Appeals for the Seventh Circuit, sitting by designation.
 SWYGERT, Senior Circuit Judge.
 
 
 1
 Taxpayer Richard Lang appeals from a June 13, 1985 order of the United States District Court for the Eastern District of North Carolina, partially enforcing two Internal Revenue Service ("IRS") summonses. Lang requests that this court deny enforcement of the summons served on him in his representative capacity as president of a small, closely-held corporation. He argues that his fifth amendment right protects him from producing the corporation's documents because it would incriminate him. In addition, Lang requests denial of the summons served upon him personally, on the basis that the summons seeks documents containing information already in the possession of the IRS. For the reasons stated below, we hold that the district court's order enforcing the summonses is correct and we affirm.
 
 
 2
 * Lang is a fifty percent shareholder and president of KAL, Inc., which operates an Aamco transmission shop in Raleigh, North Carolina. A former employee mailed a letter to the IRS, alleging that Lang may have been removing sums of money from the business. IRS Agent Elizabeth C. Camp was assigned to conduct an investigation during the summer of 1983. The IRS requested, and the taxpayer provided, his personal bank records and statements for his E.F. Hutton brokerage account for 1981. The agent examined the documents, took notes and photocopied portions of the records, and returned them. The initial analysis by Camp was that the records showed Lang to have deposited to his bank account in excess of $20,000 more than he had reported on his 1981 income tax return. The explanation Lang gave for the discrepancy was that much of the money deposited in his personal account was repayment of loans; the explanation was not satisfactory to the IRS.
 
 
 3
 The agent expanded her audit to include KAL, Inc. in order to determine whether the taxpayer was removing money from the business without reporting it on the corporate tax returns. In response to the agent's request, William Pinna, tax counsel for KAL, Inc., provided certain documents. From her examination, Camp suspected that Lang was voiding repair orders (which would result in the corporation showing "no, or zero, sale" for each voided order) and then depositing the payments from those repair orders into his personal bank account. According to Lang, the agent concluded that the business underreported its gross income by approximately eight percent in 1981 and four percent in 1982.
 
 
 4
 At this point, Pinna refused to permit Camp further access to the records. The agent thereupon issued the two summonses in question. One summons was issued to the taxpayer individually and required him to produce his cancelled checks and bank statements for his Southern National Bank checking account for 1981-83, and the statements for his E.F. Hutton brokerage account for the same years.
 
 
 5
 The second summons was addressed to Lang as "President, KAL, Inc." and required him to furnish the corporation's records concerning its checking and savings accounts at Southern National, all deposit slips to any checking account, all repair order tickets, copies of all checks deposited to the KAL, Inc. account, and copies of all loan agreements. Lang refused to produce the summoned documents, and Camp began enforcement proceedings.
 
 
 6
 Upon taxpayer's refusal to comply with the summonses, the Government petitioned the district court for enforcement. In response to the court's order that he "show cause" why the summonses should not be enforced, Lang filed a response raising a number of arguments. Lang refused to furnish the documents on the grounds that (1) performing the act of production would tend to incriminate himself; (2) the information requested was already in Camp's possession by virtue of her earlier examination; and (3) a referral to the Department of Justice had been made.
 
 
 7
 Magistrate Wallace Dixon conducted an evidentiary hearing at which Camp and Pinna testified. Camp testified that she made notes during her earlier examination of the KAL, Inc. records and photocopied portions which she thought were necessary. Counsel for Lang requested that the notes be produced so that he could cross-examine Camp concerning the information she had in her possession and which might be included in the summonses. The court sustained the Government's objection to discovery from the notes and declined to review the material in camera.
 
 
 8
 Following that hearing, the magistrate filed a memorandum in which he recommended that the summonses be enforced in part. With respect to the summons issued to Lang individually, the magistrate recommended that it be quashed with the exception of the 1981 records concerning his bank and brokerage accounts which had previously been furnished the agent. With respect to the summons issued to Lang as president of KAL, Inc., the magistrate recommended that it be enforced except in regard to checks deposited into the corporate bank account because neither Lang nor the corporation kept such records--the IRS would therefore be required to summon the bank for that information.
 
 
 9
 In analyzing the taxpayer's claim of fifth amendment privilege, the magistrate distinguished between the effect of the privilege on the summons addressed to Lang in his individual capacity and on the summons addressed to Lang in his representative capacity. As to the individual summons, he found that Lang could refuse to perform the act of producing personal and financial documents when the production itself would incriminate him. Under this rationale, Lang's being forced to furnish records not previously viewed by Camp would provide the Government information of which it was previously unaware and require Lang to admit its existence and his possession of those records in violation of his fifth amendment privilege against self-incrimination. On the contrary, Lang's production of records which Camp had already viewed could not rise to the level of a testimonial act and would not violate any privilege. As to the summons issued to Lang in his representative capacity, the magistrate found that Lang had no fifth amendment right to refuse to produce the records of KAL, Inc.
 
 
 10
 On June 13, 1985 the district court, having conducted a de novo review of the record, concluded that the magistrate had correctly ruled on all points and adopted the magistrate's recommendation as its own. The court ordered the summonses enforced in accordance with the magistrate's recommendations. The taxpayer appeals.
 
 II
 
 11
 The first issue this case raises, and the most significant, is whether an individual holding corporate documents in a representative capacity may assert a fifth amendment privilege against producing those documents in response to a subpoena. Circuits addressing the question have split over the answer. Some confusion exists in the wake of recent Supreme Court decisions on the relationship of the fifth amendment to business-related documents.
 
 
 12
 Traditionally, the fifth amendment privilege could be claimed to shield production of private documents belonging to a natural person, Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886), but could not be claimed by an organized entity like a corporation, Hale v. Henkle, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652 (1906). Corporate officials seeking to claim an individual fifth amendment privilege were denied protection because of the policy that a custodian should not be able to shield the collective entity (which has no fifth amendment privilege) from governmental scrutiny by asserting a personal right. United States v. White, 322 U.S. 694, 699, 64 S.Ct. 1248, 1251, 88 L.Ed. 1542 (1944); Wilson v. United States, 221 U.S. 361, 378-79, 31 S.Ct. 538, 543, 55 L.Ed. 771 (1911). Under this rule custodians assume the rights, duties, and privileges of the artificial entity of which they are agents or officers and they are bound by its obligations. The official records and documents that are held by them in a representative rather than personal capacity can not be the subject of the personal privilege against self-incrimination, even though production of the papers might tend to incriminate them personally. White, 322 U.S. at 699, 64 S.Ct. at 1251.
 
 
 13
 This traditional refusal to grant a fifth amendment privilege to individuals holding documents in a representative capacity reflected the importance courts attached to the notion of a privacy interest in the contents of certain papers. Under this analysis, documents held in a representative capacity reflected no privacy expectation on the part of the representative, unlike personal records. Bellis v. United States, 417 U.S. 85, 91-92, 94 S.Ct. 2179, 2184-85, 40 L.Ed.2d 678 (1974). However, this clear division between production of papers with personal content and corporate content has been blurred by recent court decisions shifting the focus away from the privacy interest of an individual in his personal papers and toward protection against testimonial self-incrimination. United States v. Nobles, 422 U.S. 225, 233 n. 7, 95 S.Ct. 2160, 2167 n. 7, 45 L.Ed.2d 141 (1975); Fisher v. United States, 425 U.S. 391, 401, 96 S.Ct. 1569, 1576, 48 L.Ed.2d 39 (1976); United States v. Doe, 465 U.S. 605, 104 S.Ct. 1237, 79 L.Ed.2d 552 (1984).
 
 
 14
 Under the modern analysis, it is irrelevant to the issue whether the documents in question are privately owned by the individual being subpoenaed or in his possession; the compelled production, identification, and authentication of incriminating materials by the possessor will incriminate him whether or not the documents are his. United States v. Cohen, 388 F.2d 464, 468 (9th Cir.1967).
 
 
 15
 Although the content of a document may not invoke the fifth amendment privilege, the act of producing the document may: the "act of producing evidence in response to a subpoena ... has communicative aspects of its own, wholly aside from the contents of the papers produced." Fisher, 425 U.S. at 410, 96 S.Ct. at 1581. Testimonial self-incrimination may be involved where enforcement of a subpoena would compel the holder to admit that the records exist, that they were in his possession, and that they are authentic. The risk of incrimination must be "substantial and real" and not "trifling or imaginary." Where the incriminating effect does exist, production of the documents is privileged and cannot be compelled without a statutory grant of use immunity. Doe, 465 U.S. at 614, 104 S.Ct. at 1243.
 
 
 16
 Thus, while Bellis may have settled the question of whether a custodian of a collective entity's documents has a fifth amendment privilege with respect to the incriminating contents of those documents (holding that the custodian cannot claim such a privilege), id. 417 U.S. at 100, 94 S.Ct. at 2189, the Supreme Court did not settle the question whether there might be a communicative and incriminatory effect of the act of production itself. In Fisher, the documents in question were prepared by accountants and were subpoenaed from taxpayers' attorneys. In Doe, the owner of sole proprietorships was served with subpoenaes demanding business records of the companies. Neither case dealt precisely with the situation here--corporation records held by its president in a representative capacity, raising his own individual fifth amendment privilege.
 
 
 17
 Circuits have split over the proper application of Fisher and Doe to the question raised in the instant matter. The majority of the circuits have held that the custodian of corporate records enjoys no right to resist a subpoena of his records even when incriminating to the custodian. In the first post-Doe decision, the Tenth Circuit held that an attorney holding client files in a representative capacity for another could not assert a fifth amendment privilege. The court underlined that the privilege had not been extended to the custodians of corporate documents or those belonging to other collective entities by the recent Supreme Court decisions. In re Grand Jury Proceedings (Vargas), 727 F.2d 941, 945 (10th Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 90, 83 L.Ed.2d 37 (1984). The First Circuit is in accord. In considering whether a physician subpoenaed to turn over appointment logs may raise a fifth amendment privilege, the court held that corporate records incriminating to the custodian may be subpoenaed, and only personal, self-created business records in the possession of their maker may be protected.
 
 
 18
 Similarly, the en banc decision in the Sixth Circuit reaffirmed the rule that a custodian of institutional records cannot claim the fifth amendment privilege. In re Grand Jury Proceedings (Morganstern), 771 F.2d 143 (6th Cir.1985). The Fifth Circuit considered the assertion of a privilege by an individual subpoenaed to produce records of multiple organizations, and held that Doe was not applicable to the records of a collective entity held in a representative capacity. In re Grand Jury Proceedings (Lincoln), 767 F.2d 1130, 1131 (5th Cir.1985). The Ninth Circuit also reached the same conclusion in United States v. Malis, 737 F.2d 1511, 1512 (9th Cir.1984).
 
 
 19
 Only the Third Circuit in In re Grand Jury Matter (Brown), 768 F.2d 525, 528 (3d Cir.1985) (en banc), held that as a general matter a custodian of corporation records (specifically a sole stockholder of a professional corporation) cannot be compelled to make self-incriminating disclosures that are testimonial, i.e., communicative or assertive in nature. The dissent, however, criticizes the Third Circuit majority for having assumed that Fisher and Doe overruled Bellis sub silentio, and argues that allowing representatives of corporations to assert their own personal privilege would effectively immunize the entity from subpoena. Instead, the dissent argues, the custodian waives to a limited extent his fifth amendment right upon assuming the duties of his office. Id. at 536, 538. See also In re Grand Jury Empanelled 3-23-83, 773 F.2d 45 (3d Cir.1985).
 
 
 20
 It is the view of this court that the most reasonable rule to establish for this circuit is that put forward to date by the Second Circuit.
 
 
 21
 In the recent decision of In re Two Grand Jury Subpoenae Duces Tecum, 769 F.2d 52 (2d Cir.1985), the Second Circuit considered the case of a custodian of records of a corporation who claimed that the effect of a subpoena was to compel his testimony in violation of the fifth amendment "act of production" doctrine. The corporation had three shareholders, but was essentially a one-man operation, because the custodian was the corporation's majority shareholder and its sole operating officer and director. In some respects, the Second Circuit decision agrees with the majority of other circuits: it holds that the custodian in the case before it had no fifth amendment right to stop the corporation from producing records. It bases the holding on its conclusion that: "Normally a corporate representative or agent cannot claim a fifth amendment privilege against producing corporate documents, regardless of whether the corporation is large or small." Id. at 56. But in distinction to the analysis employed by other circuits, the Second Circuit goes further, to caution that:
 
 
 22
 In certain limited circumstances, however, an individual may have a fifth amendment privilege against being personally compelled to produce corporate documents. As explained in Fisher v. United States, 425 U.S. 391 [96 S.Ct. 1569, 48 L.Ed.2d 39] (1976), the act of producing documents may constitute personal testimony concerning the documents' existence, their possession or control, or the fact that the one producing them believes them to be the documents described in the subpoena. When this testimony would be self-incriminating, one has a personal fifth amendment privilege to refuse to comply with a subpoena requesting production.
 
 
 23
 Id. at 57.
 
 
 24
 The Second Circuit stresses that it is only in the unusual circumstance where the corporation's custodian of records would incriminate himself if he were to act or produce the company's records that the privilege may be asserted. The individual must be personally compelled to produce and authenticate corporate records and those acts must be self-incriminatory. In re Grand Jury Subpoenas Issued to Thirteen Corporations, 775 F.2d 43, 46 (2d Cir.1985). In the typical case, when an employee produces his company's records, he is not attesting to his personal possession of them, but to their existence and possession by the corporation. Even where an individual may assert his own privilege, the corporation cannot hide behind the fifth amendment to avoid it because the corporation itself has no fifth amendment privilege. In re Two Grand Jury Subpoenae Duces Tecum, 769 F.2d at 57.
 
 
 25
 When applied in practice, the Second Circuit approach does not allow a corporation to frustrate legitimate governmental regulation. In United States v. Barth, 745 F.2d 184 (2d Cir.1984), cert. denied, --- U.S. ----, 105 S.Ct. 1356, 84 L.Ed.2d 378 (2d Cir.1985), as president of five small corporations, Barth refused on the grounds of self-incrimination to testify about what corporate books were kept or who was responsible for keeping them. Instead, Barth's attorney furnished the Government with a list of employees who had knowledge about the records. The listed employees themselves then appeared by counsel to inform the court that each of them intended to invoke his own privilege. The judge ordered the corporation to comply with the summons by producing someone--any knowledgeable employee, or even a new agent--to testify about the records. The judge made it clear that the basic obligation of the corporation was to make every reasonable effort to obey. Id. at 189.
 
 
 26
 We agree with the Second Circuit's approach: the basic rule of Bellis continues after Doe, and normally a corporate representative or agent cannot claim a fifth amendment privilege against producing corporate documents. There will be rare occasions where an individual's production of those documents may amount to testimonial self-incrimination. In those limited circumstances, the individual has a personal fifth amendment privilege, but the corporation must comply with the summons through some other person.
 
 
 27
 Our final task is to apply this rule to analyze whether the tacit averments of taxpayer Lang are both "testimonial" and "incriminating" so as to fall into that narrow situation where he may invoke a fifth amendment privilege. We apply by analogy the analysis used by the Supreme Court in other contexts.
 
 
 28
 The Court considers whether the act of production may constitute personal testimony conceding the document's existence, possession, or control. First, as to possession and existence, the court must determine whether the existence and location of the papers is a foregone conclusion. In Fisher the papers at issue were of a kind usually prepared by an accountant working on a client's tax return, so, therefore, the taxpayer added little or nothing to the sum total of the Government's information by conceding that he in fact had the papers. The Court specifically noted that it had time and again allowed subpoenae against the custodian of corporate documents or those belonging to other collective entities over claims that the documents would incriminate the custodian despite the fact that producing the documents tacitly admits their existence and location in the hands of their possessor. Fisher, 425 U.S. at 411, 96 S.Ct. at 1581.
 
 
 29
 Second, as to authentication the court must determine whether responding to a subpoena would authenticate the work papers, whether threat of producing the documents constitutes testimony that the producer believes them to be the documents described in that subpoena. In Fisher the taxpayer did not prepare the papers and could not vouch for their accuracy. The taxpayer was no more competent to authenticate the reports by producing them than he would be to authenticate them if testifying orally. The custodians of corporate, union, or partnership records have been ordered to respond to a subpoena for the business' books even though doing so involved a "representation that the documents produced are those demanded by the subpoena." Id. at 413, 96 S.Ct. at 1582, citing Curcio v. United States, 354 U.S. 118, 125, 77 S.Ct. 1145, 1150, 1 L.Ed.2d 1225 (1957).
 
 
 30
 In the instant case, the district court correctly concluded that Lang's act of producing corporate documents would not amount to testimonial self-incrimination by proving possession, existence, or authentication. The subpoena was directed to Lang in his capacity as president of KAL and, as such, in providing the records he would not be attesting to his personal possession of them but to their possession by the corporation, which can claim no fifth amendment privilege.
 
 
 31
 Lang's production of repair orders, bank account statements, and shareholder loan agreements is hardly incriminating here. Lang does not dispute the existence of any of the records he is required to produce or that they are in the possession of the corporation. Indeed, the IRS agent had been given access to and has examined some or all of the records except for the loan agreements between the taxpayer and the corporation (and she had sufficient prior knowledge about those agreements to make a specific request for them). Lang's act of producing those records would add little or nothing to the sum total of the Government's knowledge of the existence and location of the summoned records.
 
 
 32
 Finally, because Agent Camp can identify the records, the Government need not rely on Lang's act to verify that the documents are in fact what they purport to be. This is not a case where the custodian is incriminated automatically by demonstrating his knowledge or control of the records, as in In re Grand Jury Subpoenas Duces Tecum, 722 F.2d 981, 987 (2d Cir.1983) (corporate officer may refuse to produce corporate records when the mere fact of possession is incriminating). Nor is this a case where the Government is clearly subpoenaing the records in order to have the custodian of records authenticate them through production (condemned in United States v. Porter, 711 F.2d 1397, 1401 (7th Cir.1983)).
 
 
 33
 We cannot agree with Lang that the district court ruled that production would not incriminate Lang solely because he was acting in a representative capacity. Instead, the court explicitly considered whether production would have testimonial significance by showing existence or possession or authentication. The court concluded that enforcement of the summons to Lang to produce KAL's business records would not violate his fifth amendment rights. We agree. While in a rare case an individual acting in a representative capacity may be able to assert a fifth amendment privilege--and force the corporation to appoint another person to produce the documents--this is not that unusual case. The court's order enforcing the summons addressed to Lang in his representative capacity is correct.
 
 II
 
 34
 The only issue remaining is appellant's claim that the district court erred in holding that the IRS summons did not require production of information already in the Government's possession and that enforcement of the summons did not violate the prohibition against second inspections contained in section 7605(b) of the Internal Revenue Code. We find no merit to the claim.
 
 
 35
 Section 7605(b) provides, as to restriction on time and place of examination of records, that
 
 
 36
 No taxpayer shall be subjected to unnecessary examination or investigations, and only one inspection of a taxpayer's books of account shall be made for each taxable year unless the taxpayer requests otherwise or unless the Secretary, after investigation, notifies the taxpayer in writing that an additional inspection is necessary.
 
 
 37
 There was no re-examination of Lang's records within the meaning of that section; the examination had never been closed. The agent was summoning the documents for a permissible "second look." As this court recently pointed out in United States v. Morgan, 761 F.2d 1009, 1011 (4th Cir.1985), section 7605(b) prohibits only unnecessary audits and second inspections without notice after the IRS has completed the first audit or investigation to determine the taxpayer's correct liability. Beyond the question of what harm is suffered by Lang in the first place, there is nothing in the law to prohibit the IRS agent from reviewing his records for the different and additional purpose of comparing the corporate and individual documents. The district court's order enforcing the summons addressed to Lang individually is correct.
 
 
 38
 Accordingly, the decision of the district court is AFFIRMED.