581 F.2d 431
 78-2 USTC P 9736, 3 Fed. R. Evid. Serv. 1434
 UNITED STATES of America and Robert E. Grant, Special Agent,
Internal Revenue Service, Plaintiffs-Appellees,
v.
A. Burton HANKINS, Individually and as Executor of the
Estate of Bewel A. Hankins, et al., Defendants-Appellants,
Robert Lewis Smith, Intervenor-Appellant.
UNITED STATES of America and Robert E. Grant, Special Agent,
Internal Revenue Service, Petitioners-Appellees,
v.
A. Burton HANKINS and Hugh C. Montgomery, Jr., Respondents-Appellants.
 Nos. 76-3467, 77-1967.
 United States Court of Appeals,
Fifth Circuit.
 Oct. 3, 1978.
 
 Paul P. Lipton, Milwaukee, Wis., James S. Nippes, Jackson, Miss., for Burton Hankins.
 Charles L. Brocato, Jackson, Miss., for Hugh C. Montgomery, Jr.
 J. N. Raines, Michael Robinson, Memphis, Tenn., L. Arnold Pyle, John G. Gourlay, Jr., Jackson, Miss., for Robert L. Smith.
 H. M. Ray, U. S. Atty., Thomas W. Dawson, William M. Dye, Jr., Asst. U. S. Attys., Gilbert E. Andrews, Acting Chief, Appellate Section, Myron C. Baum, Acting Asst. Atty. Gen., Robert E. Lindsay, Charles E. Brookhart, William A. Whitledge, Alfred E. Moreton, III, M. Carr Ferguson, Attys., Tax Div., Dept. of Justice, Washington, D. C., for the U. S.
 Appeals from the United States District Court for the Northern District of Mississippi.ON PETITIONS FOR REHEARING AND PETITIONS FOR REHEARING EN BANC
 (Opinion January 12, 1978, 5 Cir., 1978, 565 F.2d 1344).
 Before COLEMAN, SIMPSON and TJOFLAT, Circuit Judges.
 COLEMAN, Circuit Judge.
 
 
 1
 No member of this panel nor Judge in regular active service on the Court has requested that the Court be polled on rehearing en banc (Fed.R.App.P. 35; Local Fifth Circuit Rule 12). Therefore, the various Petitions for Rehearing En Banc are denied.
 
 
 2
 The panel which originally heard and decided these appeals has nevertheless thoroughly re-examined the issues and finds that it must adhere to the previously rendered opinion, United States v. Hankins, 5 Cir. 1978, 565 F.2d 1344.
 
 
 3
 We consider it not out of order, however, to state additional reasons supporting the results announced in that opinion.[1] We also grant the government's request for clarification as to one aspect of the case affecting Mr. Montgomery.
 
 I. The Hankins Appeal, No. 76-3467
 
 4
 In our prior opinion, we held that partnership records have no Fifth Amendment immunity to subpoenas in Internal Revenue investigations of tax liability. This clearly covered the partnership records in existence prior to the death of Mr. Bewel Hankins on November 19, 1971.
 
 
 5
 For the reasons stated in the opinion, we also held that the same rule applied to the Hankins' records for 1972.
 
 
 6
 As we noted before, 565 F.2d at 1349, much of the confusion surrounding the 1972 records was caused by "the Revenue Agent and the Attorney for the Department of Justice uniformly (referring) to the 1972 operations as a sole proprietorship". We are entirely convinced that the operations in 1972 were not, and could not have been, the activities of a sole proprietorship. This may affect the individual tax liability of A. Burton Hankins for that year, but that issue is not involved in the case at this point.
 
 
 7
 Mr. A. Burton Hankins' arguments for rehearing may be grouped into two categories: (1) that the government never sought the 1972 records, and (2) that, in any case, those records are nevertheless the records of a sole proprietorship (private papers) which he cannot be forced to produce.
 
 
 8
 As for the first point, we think it best to begin at the beginning. The summons in question, served on Burton Hankins on March 10, 1975, sought production of "(a)ll records in your possession pertaining to the Hankins Lumber Company partnership for the years 1968, 1969, 1970, 1971, and 1972 . . . (emphasis added)." Hankins appeared in response to the summons, but refused to turn over the summonsed documents. The United States filed a petition to enforce the summons, the District Court held a consolidated hearing on March 1, 1976, and issued its Memorandum of Decision on July 15, 1976. It was found as a matter of fact that the two brothers had operated a jointly owned partnership "(f)rom approximately 1957 until November 19, 1971 . . . ." The District Judge also drew the legal conclusion that the partnership had terminated on the death of Bewel Hankins.[2] On August 10, 1976, the District Judge ordered Hankins to produce, Inter alia, "(a)ll records in your possession pertaining to the Hankins Lumber Company partnership for the years 1968, 1969, 1970, 1971, and 1972 . . . ." It therefore seems clear to us that the government has at all times sought the "partnership" records.
 
 
 9
 Consequently, we move to the second point.
 
 
 10
 The Hankins partnership existed by virtue of Mississippi law, so it is to that law that we turn for a rule of decision. At the time of the death of Bewel Hankins, Mississippi had not yet enacted its version of the Uniform Partnership Act.[3] The partnership, therefore, was governed by the common law, except where modified or supplemented by statute. In 1971, the only relevant statutes which we have been able to uncover were found in Miss. Code Ann. §§ 553-560 (1942).[4] These sections regulated the executor or administrator of a deceased partner's estate and prescribed what actions he shall take for the benefit of heirs, devisees or legatees. With the approval of the chancellor, the executor or administrator might sell the decedent's interest in the partnership estate. Id. at § 553. He shall also conduct an inventory of the partnership accounts. Id. at § 554. Once the appraisal is completed, he may take control of such an amount of the partnership assets as will equal the decedent's interest, or he may allow those assets to be managed by the surviving partner, who must then post a bond. Id. at §§ 554-555. This bond should be an amount equal to the value of the partnership estate and not merely that of the interest of the deceased partner, Gurley v. Gurley, 77 Miss. 413, 26 So. 962 (1900).[5]
 
 
 11
 In the event that the surviving partner declines to act, the executor or administrator shall post bond, take possession of the assets, and liquidate. Miss. Code Ann. §§ 558-559 (1942). Furthermore, the surviving partner is under a duty to exhibit all partnership property to the appraiser. If the executor must administer the estate, the surviving partner is under a further duty to turn over "books and papers and all necessary documents". Id. at § 560. Although the Code does refer in two places to the "trust" obligations of the executor or administrator, those two sections are only applicable if the surviving partner declines to account. See id. at §§ 559-560.
 
 Section 557, however, provides:
 
 12
 The court shall have the same authority to cite such surviving partner to account, and to adjudicate upon his accounts as in the case of an administrator; and the parties interested shall have the like remedies on such bond for any misconduct or neglect of the survivor as may be had against administrators.
 
 
 13
 Since the status of an administrator is defined by statute to be that of a trustee, and since interested parties, namely the heirs of the deceased partner, have the same remedies against the survivor as against an administrator, again as provided by statute, it follows A fortiori that vis-a-vis heirs and legatees the surviving partner stands in the same shoes as an administrator, namely that of a trustee and he cannot thereafter legally proceed as a sole proprietor.
 
 
 14
 A surviving partner, who accepts his statutory obligations and proceeds to satisfy the claims of the heirs of his deceased partner, operates the business in a fiduciary capacity. In Gurley v. Gurley, supra, the Court unequivocally stated, "At law, upon the death of one of the partners the surviving partner is invested with the title and possession of the partnership property, But in equity (emphasis added) he is a trustee for all parties concerned . . . ." 26 So. at 962. The Court left no doubt about the status of the surviving partner by saying that any "hardship (caused by the bond requirement) may be soon removed by a speedy execution of the trust". 26 So. at 963.[6]
 
 
 15
 Statutory law made Burton Hankins a trustee, and so did the common law of Mississippi. In Robertshaw v. Hanway, 52 Miss. 713 (1876), a case decided prior to the first enactment of partnership statutes in 1892, the Court was confronted with a claim against a dissolved partnership. In the course of its opinion, the Supreme Court stated:
 
 
 16
 "upon a dissolution of a firm, by the death of one of its members, the credits and personal effects vest, by operation of law, in the survivors, and under judgment against them the effects of the firm may be sold. The real estate, however, preserves its distinct qualities and descends to the heir of the decedent, who holds in common with the survivor in trust for the purposes of the partnership, first for the creditors, and, second for the members of the firm and their representatives, according to their several interests." 52 Miss. at 716.
 
 
 17
 We look next to the case of Mayson's Administrator v. Beazley's Administrator, 27 Miss. 106 (1854) which in the 124 years since it was handed down has never been undercut by any subsequent statute or Mississippi Supreme Court decision. Mayson and Beazley formed a partnership for the purchase and operation of a sawmill (a type of activity quite similar to that which we have in the instant case). After a year or so, Beazley died and Mayson continued to operate the business, allegedly realizing large profits for which he failed to account to Beazley's administrator. The latter then sued and won a large judgment in the lower court, whereupon Mayson appealed, complaining primarily about the exclusion of certain of his evidence. The Court held that Beazley's administrator could recover a share of the profits earned After Beazley's death and that Mayson was entitled to prove his legitimate expenses. The Court also delivered itself of a full exposition on the law governing the dissolution of partnerships. We quote it in full because of its clarity and its important relevance to this case:
 
 
 18
 By the death of Beazley the partnership was dissolved. The legal title to the property survived to Mayson only for the purpose of enabling him to pay the copartnership debts. As to the beneficial interest in the property, Mason and Beazley's representatives were tenants in common. It was the right of the representative of the deceased partner to call for an account at any time, and Mayson's duty to give it when demanded. Till the account was given, or the business closed by a sale of the property, a court of equity will, for certain purposes, regard the partnership as still in existence, and will require the survivor to account for whatever profits he may have made by the use of the property or the employment of the joint capital. Or, to state the proposition in a few words, if the survivor has made profits he must account for them upon the terms regulating the copartnership; if he has made nothing by continuing the business, he is accountable only as a tenant in common. 27 Miss. at 112.
 
 
 19
 It is true, of course, that when a partner dies, in the absence of a prior agreement providing for the continuation of the partnership after death, the partnership is dissolved because the surviving partner cannot continue doing business with, for, or on behalf of a dead man. But dissolution does not mean that the partnership thereby instantaneously disappears. For various purposes, it continues to live until it is lawfully sold or its affairs have been lawfully wound up. The surviving partner does not become the sole proprietor of the partnership or its assets. Burton Hankins, as the executor of his brother's estate, owed Bewel's legatees the fiduciary duties of a trustee. For the purpose of accounting for any profits realized by virtue of his continued employment of the partnership assets, the partnership was still alive. Its books and records were not, and could not have been, the private property of Burton Hankins.[7]
 
 
 20
 When did the partnership terminate? Frances Hankins, Bewel Hankins' widow, on August 11, 1972, executed a quitclaim deed conveying her one-fourth interest in the partnership to Burton Hankins and the Chancery Court approved that sale the next day. On October 18, 1972, the Chancery Court granted a petition by Burton Hankins to purchase the remaining portion of the estate's interest in the partnership. A bill of sale and warranty deed, conveying to Burton the estate's interest in the partnership property and real estate, were executed on November 3, 1972, and December 14, 1972. However, there were special circumstances present here which extended the life of the partnership. In the proceedings before the Chancery Court there was testimony that it was the testator's wish that the children stay in the business, (R. 433), and the court so found. (R. 502). In its decree authorizing Burton Hankins to purchase the remaining interest of the estate in the partnership assets, the Chancery Court permitted the purchase "with the understanding that the guardian of the minor children of Bewel A. Hankins, deceased, will have the right to purchase stock for the children in an amount equal to the value of their interest in said former partnership assets, which said stock will be placed in a trust fund and administered by the Trustee, which trust is to be set up at the appropriate time." (R. 503). In its later order releasing Burton Hankins from his duties as executor, the Chancery Court "further decreed that the equitable interest of the three sons in the business formerly operated as a partnership known as Hankins Lumber Company, and which has now been incorporated as Hankins Lumber Company, Inc., should be converted to shares of stock in said corporation . . . ." Plainly, the court of equity regarded the partnership as continuing in existence until the business was incorporated. See Mayson's Adm'r v. Beazley's Adm'r, supra.
 
 
 21
 Thus, the books, records, and papers of the lumber business from November 19, 1971, to January 2, 1973, were not the personal papers of Burton Hankins, but the papers of a partnership which continued in existence by operation of law until the surviving partner fulfilled his obligations under Mississippi law to wind up the business and account for all interim profits to the estate of the decedent. For this additional reason, we adhere to our earlier decision affirming the District Court's order that the summons to Mr. A. Burton Hankins be enforced. Bellis v. United States, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974); United States v. Greenleaf, 5 Cir. 1977, 546 F.2d 123.
 
 II. Hankins' Appeal in No. 77-1967
 
 22
 In No. 77-1967, Hankins also petitions for rehearing. His argument is as follows: he did not have the records on the date of the contempt hearing, he cannot be cross-examined as to the reasons for the disappearance of the records, and he cannot be confined indefinitely when he lacks the ability to comply with the order of the District Court. He did not testify at the contempt hearing, nor did he present any evidence of inability to comply.[8] Among the citations in his brief, Hankins relies primarily on Curcio v. United States, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957); Maggio v. Zeitz, 333 U.S. 56, 68 S.Ct. 401, 92 L.Ed. 476 (1948); United States v. Rizzo, 5 Cir. 1976, 539 F.2d 458; and Cagle v. Scroggins, 5 Cir. 1969, 410 F.2d 741. None of these cases aids Hankins.
 
 
 23
 In Maggio, the Court reversed a court of appeals decision affirming a coercive sanction when the latter court was absolutely convinced that Maggio could not comply with the order. The critical difference between Maggio and the present case is that Maggio himself Had testified and Had subjected himself to cross-examination. In Cagle and Rizzo, both individuals testified that they were unable to produce the records demanded and both were subject to cross-examination. In Curcio, the Court reversed a criminal contempt conviction of an individual for invoking his Fifth Amendment privilege and refusing to testify as to the whereabouts of corporate records which he had not produced in response to a subpoena duces tecum, but Curcio did not involve a refusal to testify in a contempt proceeding. The difference between Curcio and this case is that in the contempt proceeding here, the court ordered Hankins to appear and show cause why he could not be held in contempt for disobeying a prior order. With the fact of non-compliance with the court's previous order clearly and convincingly established, Hankins' failure to testify, presumably resting on his Fifth Amendment right not to testify, means that he has failed to show cause why he should not be held in contempt of an outstanding order.[9]
 
 III. Montgomery's Case
 
 24
 Subsequent to the publication of our opinion in these two cases consolidated on appeal, the government filed a motion for clarification of the Court's decision with respect to appellant Montgomery in No. 76-3467. Montgomery filed a petition for rehearing.
 
 
 25
 Both the government and appellant Montgomery point out that our opinion did not specifically address Montgomery's appeal from the lower court's order in the summons enforcement proceeding.[10] Although our opinion did state that "(t)he other errors assigned by the respective appellants have been duly considered and found to be without merit," 565 F.2d at 1352, we now believe that a clarification is not out of order.
 
 
 26
 The most basic argument[11] is that Mr. Montgomery should not be compelled to give general oral testimony concerning communications privileged by virtue of the attorney-client relationship. Montgomery apparently argues[12] that the District Court improperly ordered him to testify generally and precluded Montgomery from raising any proper claims of attorney-client privilege. He bases his argument on the sentence in the District Court's Memorandum of Decision which states that "orders will be issued requiring each individual respondent to appear before Special Agent Grant or his authorized representative to be sworn and to give testimony or to claim a Personal privilege as to particular questions." 424 F.Supp. at 613 (emphasis in original). It seems clear to us that the District Judge had no intention of ignoring the rule that the attorney-client privilege may be asserted either by the client or by the attorney on behalf of the client, in the absence of waiver or some other recognized exception to the assertion of the privilege. See generally Fisher v. United States, 425 U.S. 391, 403-405, 96 S.Ct. 1569, 48 L.Ed.2d 39 (1976); Fed.R.Evid. 501;[13] 8 J. Wigmore, Evidence § 2324 (McNaughton rev. ed. 1961) ("That the Attorney himself is prohibited (from disclosing his client's confidences), whether he is willing or not, is of course the fundamental assumption of the modern theory.") Indeed, the District Court's opinion clearly indicates that he understood this rule, for he stated that Montgomery could neither claim a Blanket attorney-client privilege nor assert another Person's personal privilege against self-incrimination. Neither the Memorandum of Decision nor the subsequent order prevents Montgomery from properly raising the attorney-client privilege in subsequent proceedings. Furthermore, the record indicates that the government never sought to compel Montgomery to divulge any information in violation of the privilege. (R. 303). What we said in our original opinion relative to Hankins is therefore equally applicable to Montgomery:
 
 
 27
 The requirement that Mr. (Montgomery) testify before the Internal Revenue Agent is, of course, subject to the rule prevailing in this Circuit that he must appear in response to the summons, thereafter the Internal Revenue Service must propound specific questions, and the witness may then claim the privilege as to each question, United States v. Malnik, 5 Cir. 1974, 489 F.2d 682; United States v. Roundtree, 5 Cir. 1970, 420 F.2d 845.
 
 
 28
 United States v. Hankins, supra, 565 F.2d at 1349-50.
 
 
 29
 The final point which Montgomery raised in his appeal was an argument that the District Court's order expanded the scope of the summons. The investigation concerned Hankins' tax years 1969 through 1973, but the summons to Montgomery sought testimony only for the years 1969 through 1972. Nevertheless, the District Court ordered Montgomery to testify relative to Hankins' tax liability for 1973. Upon re-examination, we conclude that the order could not validly expand the scope of the summons as issued and served and that the order should be modified so that it will clearly indicate that Montgomery is required to testify regarding only the years 1969 through 1972, but not in violation of the attorney-client privilege, as the summons indicated. Although it is the rule in this Circuit that a District Court has some discretion to modify a summons in order to remove ambiguities or to cure the summons of overbreadth, United States v. Malnik, 5 Cir. 1974, 489 F.2d 682, 686 n.4,[14] the District Court does not have power to modify the summons in order to expand its scope. If the IRS needs the testimony of Montgomery relative to Hankins' tax liability for 1973, during which year Hankins' business was incorporated and for which the IRS already has the corporate records, it may consider the issuance of another summons to Montgomery and make the proper showing under United States v. Powell, 379 U.S. 48, 85 S.Ct. 248, 13 L.Ed.2d 112 (1964).
 
 CONCLUSION
 
 30
 With the above clarification as to Mr. Montgomery's testimony for the year 1973, all petitions for rehearing are
 
 
 31
 DENIED.
 
 
 
 [1]
 We consider Hankins' petition for rehearing to embrace the period of time from November 19, 1971, when his brother and partner, Bewel Hankins, died, to January 2, 1973, when the new corporation, Hankins Lumber Company, Inc., was formed. It is Hankins' contention that the business was operated as a sole proprietorship during that time, and that the records of that sole proprietorship are his personal records, which, according to Hankins, are protected by the Fifth Amendment. He has not requested a rehearing on our affirmance of the District Court's orders enforcing the summonses seeking the papers related to the estate taxes of Bewel Hankins, the Boswell audit papers, and the partnership records dated prior to November 19, 1971. In connection with this petition, we have reexamined those holdings and are convinced that they are correct. We therefore consider only the records of the lumber business from November 19, 1971, to January 2, 1973, but we shall refer to them as "the 1972 records."
 
 
 [2]
 These findings track the stipulation of the parties that the partnership terminated at the death of one of the partners. (R. 79). Hankins also makes much of the government's "concession" of this point, as well as the fact that the government introduced Hankins' tax returns for the period in question into evidence. Those returns indicate that he operated the lumber business as a "sole proprietorship." We think that neither the "concession", nor the tax returns, nor the testimony of the IRS agents are determinative of the legal issue involved, namely, was this business a partnership or a proprietorship during the period between Bewel's death and the incorporation?
 
 
 [3]
 The Mississippi Uniform Partnership Act became effective April 1, 1977, and is now codified at Miss. Code Ann. §§ 79-12-1 through 79-12-85 (1977 Supp.). That Act provides that dissolution is caused by the death of one of the partners, unless the partnership agreement provides to the contrary. Miss. Code Ann. § 79-12-61(4) (1977 Supp.). However, it also provides that "(o)n dissolution, the partnership is not terminated, but continues until the winding up of partnership affairs is completed." Miss. Code Ann. § 79-12-59 (1977 Supp.). Upon the death of a partner, the partnership may be continued with the consent of the deceased's representative, who then assumes the status of a creditor entitled to his share of the partnership with interest or a proportionate share of the profits. Miss. Code Ann. § 79-12-83 (1977 Supp.). We cite these provisions, not because they are dispositive (since they are not), but because they do provide some insight into the law of the State of Mississippi in 1971
 
 
 [4]
 These statutes were carried forward in the 1972 Code in §§ 91-7-119 through 91-7-133. These sections were subsequently repealed when the Legislature enacted the Mississippi Uniform Partnership Act. 1976 Miss. Laws ch. 407, § 44
 
 
 [5]
 This bond was not posted until the appraisal had been completed. Hankins, in his petition to the Chancery Court, asserted that liquidation of the business would result in "tremendous financial loss to the Estate" and that the book value might not represent the true value of the partnership assets. (R. 422). He therefore requested permission to continue the business
 
 
 [6]
 This case was apparently one of the first cases to authoritatively construe the statute which was the direct predecessor to Miss. Code Ann. § 91-7-123 (1972). No later case has repudiated that language
 
 
 [7]
 Since Mayson's Adm'r states the common law of Mississippi, one might conclude that present § 79-12-59 of the Miss. Code is a codification of that common law rule. See note 3, Supra. This result under Mississippi law means that the partnership continued for federal income tax purposes. See Treas.Reg. § 1.708-1(b)(1)(i)(a) (1978)
 
 
 [8]
 When the court refused to allow Hankins to testify on the condition that he not be subject to cross-examination, counsel tendered an "offer of proof" to the effect that Hankins would have testified that he did not have the missing records at that time, nor when he appeared before the IRS agent in response to the summons, nor when the summonses were served. In view of our conclusion on the contempt citation, what was said by the Supreme Court in Maggio v. Zeitz, 333 U.S. 56, 69, 68 S.Ct. 401, 408, 92 L.Ed. 476 (1948), is especially relevant to Hankins' attempt to relitigate the District Court's earlier finding that Hankins had the records when the court ordered the summons enforced:
 It would be a disservice to the law if we were to depart from the long-standing rule that a contempt proceeding does not open to reconsideration the legal or factual basis of the order alleged to have been disobeyed and thus become a retrial of the original controversy. The procedure to enforce a court's order commanding or forbidding an act should not be so inconclusive as to foster experimentation with disobedience. Every precaution should be taken that orders issue, in turnover as in other proceedings, only after legal grounds are shown and only when it appears that obedience is within the power of the party being coerced by the order. But when it has become final, disobedience cannot be justified by re-trying the issues as to whether the order should have issued in the first place.
 
 
 [9]
 Of course, should Hankins produce the records or become willing to testify, criminal contempt proceedings might then be appropriate. See United States v. Rizzo, 5 Cir. 1976, 539 F.2d 458; 18 U.S.C. § 401; Fed.R.Crim.P. 42
 
 
 [10]
 This order was a "final" order for purposes of 28 U.S.C. § 1291 and therefore appealable. Reisman v. Caplin, 375 U.S. 440, 84 S.Ct. 508, 11 L.Ed.2d 459 (1964); United States v. Malnik, 5 Cir. 1974, 489 F.2d 682; United States v. Roundtree, 5 Cir. 1970, 420 F.2d 845. Our earlier holding that Montgomery's appeal in No. 77-1967 must be dismissed due to the lack of a final order implicitly declined to convert the appeal into a petition for mandamus or an interlocutory appeal under 28 U.S.C. § 1292(b). That holding has not been challenged by the parties, and we adhere to it
 
 
 [11]
 Montgomery also contests the jurisdiction of the District Court to enforce the summons and cites the appropriate statute, 26 U.S.C. § 7402(b), which grants jurisdiction to "the district court of the United States for the district in which such person resides or may be found . . . ." Montgomery characterizes this statute as a grant of subject matter jurisdiction, but we think this assertion incorrect. It seems that 26 U.S.C. § 7402(a) is the general jurisdictional statute, and that statute specifically states that the remedies which it provides are not exclusive. 28 U.S.C. § 1345 also provides jurisdiction here. We therefore conclude that the language upon which Montgomery relies is in the nature of a venue provision. It is elementary that venue can be waived if not timely raised, See generally C. Wright, A. Miller & E. Cooper, 15 Federal Practice and Procedure § 3829 (1976), and the lower court properly found that Montgomery had so waived his challenge. See United States v. Hankins, 424 F.Supp. 606, 612-13 (N.D.Miss.1976). Any objections to the service of process or jurisdiction over the person of Montgomery were also waived. See Fed.R.Civ.P. 12(b)(1)
 
 
 [12]
 We use the word "apparently" because many of his factual arguments relate to what actually occurred at the hearings. In No. 76-3467, however, we are concerned only with the validity of the summons enforcement order
 
 
 [13]
 Contrary to the assumption of counsel for appellant Montgomery in the court below, (R. 60-61), state law does not determine the scope of the attorney-client privilege. This is a case in which federal law supplies the rule of decision, and the federal common law therefore determines the scope of the privilege. See Conference Rep. No. 93-1597, 93rd Cong., 2d Sess. 7-8, Reprinted in (1974) U.S.Code Cong. & Admin.News pp. 7100-7101. For a similar holding by this Circuit prior to enactment of the Federal Rules of Evidence, see Garner v. Wolfinbarger, 5 Cir. 1970, 430 F.2d 1093, Cert. denied, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971)
 
 
 [14]
 United States v. Solomon, 5 Cir. 1971, 437 F.2d 110, is not to the contrary. That case simply affirmed a district court's refusal to enforce a summons on grounds of ambiguity, and there was no showing of abuse of discretion