UNITED STATES of America and Albert Rodriguez, Jr., Plaintiffs-Appellees,

v.

George W. MEEKS, as President of St. George Company, Defendant-Appellant.

No. 80–2370.

United States Court of Appeals,
Fifth Circuit.
Unit A

April 17, 1981.

Ronald P. Guyer, San Antonio, Tex., for defendant-appellant.

Michael L. Paup, Chief, Charles E. Brookhart, Richard N. Bush, Attys., M. Carr Ferguson, Asst. Atty. Gen., Tax Division, U. S. Dept. of Justice, Washington, D. C., for plaintiffs-appellees.

Before CHARLES CLARK, REAVLEY and WILLIAMS, Circuit Judges.

JERRE S. WILLIAMS, Circuit Judge:

On February 10, 1981, 642 F.2d 732, this Court vacated an order of the United States District Court for the Western District of Texas adjudging appellant George W. Meeks in contempt of court for failure to produce records of the St. George Corporation or to explain why he could not produce them, and ordering his confinement until he purged himself of contempt. The brief opinion by the Court issued on that date indicated that an explanation of the decision of the Court would follow, and this opinion is that explanation.

Appellant George W. Meeks was the president and one of two stockholders of the St. George Corporation which was under investigation by the Internal Revenue Service in the spring of 1979. On June 12, 1979, the Court ordered Meeks to produce records of the corporation. In response to this order Meeks appeared in person before an IRS agent on June 22, 1979. At that time he indicated he had access to a great many corporate records, that there were boxes and boxes of records, and he made inquiry concerning and requested transactional immunity. Immunity was not granted.

On August 21, 1979, the district court ordered him to appear before the IRS on September 13 and produce the records. It further ordered that if he failed to appear he was directed to appear in the district court to show cause why he had failed to comply. Meeks did appear before IRS agent Albert Rodriguez, Jr. on September 13, 1979. He produced some twenty docu-

ments which were of little or no use in the tax investigation. He then told the agent that he did not have and could not locate other corporate records. He indicated that possibly some records might be reconstructed and that a substantial amount of the records might have been destroyed because of difficulty with the computer in which they had been entered.

At the show cause hearing later in the month of September 1979, Meeks made various motions, and the show cause portion of the hearing was finally set for October 30, 1979. On that date the district court denied all of Meeks' motions and issued an order requiring him to produce the documents on November 16, 1979. Three days before that scheduled court appearance he filed a notice of appeal from the October 30 order and a motion for stay. The stay was granted.

On March 11, 1980, the Court of Appeals dismissed Meeks' appeal for want of prosecution and for failure to file his brief. Over five months later, on August 22, 1980, the IRS filed a motion for an order to enforce the summons for the documents. The district court ordered Meeks to produce the records on October 6, 1980. He appeared on October 6 but refused to answer any specific questions about the whereabouts of its records on the ground that the answers might tend to incriminate him.

At a show cause hearing on November 25, 1980, Meeks refused to testify but submitted a declaration to which he was willing to swear that he had provided the IRS with all of the records which he had in his possession which were covered by the order. He refused to answer any further questions concerning the documents on the ground the answers might tend to incriminate him. The court refused to accept the declaration. It found that the records did then exist or, in the alternative, had been in existence prior to the June 12, 1979, summons. It further found that Meeks had failed to submit acceptable proof of his claimed inability to comply, and adjudged him in civil contempt. His confinement was ordered until he purged himself of the contempt by complying with the summons either by produc-

ing the records or testifying to explain why he could not produce them. This is the order which was appealed.

There is some evidence in the record which can justify a finding of fact that the records were in existence at the time of the original summons. As to evidence that they did not exist at the time Meeks was sentenced to civil contempt, he has said over and over again that they do not exist and in his submitted statement which was to be sworn this was indicated. In addition, in his talk with agent Rodriguez on September 13, 1979, he stated that the documents were not in existence or at least were not in his possession and that he could not locate them.

It is the position of the IRS that the only way Meeks could purge himself of contempt was to produce the records or to explain why he could not produce them. Further, it is asserted the burden was on Meeks to prove that he could not produce the records. To the contention by Meeks that explaining what had happened to the records would require him to sacrifice his claim of privilege against self-incrimination, the IRS is unmoved. The Service asserts that Meeks' proof that he cannot comply with the summons is inadequate.

In *United States v. Hankins*, 565 F.2d 1344 (5th Cir. 1978); 581 F.2d 431 (5th Cir. 1978), this Court upheld a civil contempt order with an indefinite period of confinement in a case with similar facts. In that case, Hankins was ordered to turn over partnership records. He claimed the privilege against self-incrimination as against the obligation to produce the documents. This claim obviously was not effective because these were business documents and not personal documents. It is elementary that the claim of the privilege is a personal one and does not extend to the activities of a business entity, including a partnership, of which the person subpoenaed is or was a part. *Bellis v. United States*, 417 U.S. 85, 94 S.Ct. 2179, 40 L.Ed.2d 678 (1974).

At a contempt hearing Hankins offered to testify as long as he was not cross-exam-

ined and this offer was refused. It is important, however, to note that he made no claim of the privilege against self-incrimination as it related to testimony as to what happened to the missing ledger pages which were involved in the order. *United States v. Hankins, supra* at 565 F.2d 1344.

In the *Hankins* case a motion for rehearing en banc was then denied by the Court, but the Court wrote a clarifying opinion. The Court confirmed that the records involved were business records and that Hankins could not claim the privilege with respect to them. This was the basic thrust of the revised opinion. *United States v. Hankins*, 581 F.2d 431 (5th Cir. 1978), *cert. denied*, 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979). In a footnote the Court opinion made clear that it saw Hankins' attempt to justify his refusal to respond to the summons actually was an attempt to relitigate the district court's earlier specific finding based upon lawful evidence that Hankins did have the records when the Court ordered the summons enforced.

There are three significant distinctions between the *Hankins* case and the case before the Court. In *Hankins*, the claim of the privilege against self-incrimination was made against the production of documents on the erroneous ground that a person could claim the privilege against the production of the papers of a business entity. There is no indication in the case that Hankins made a specific claim of the privilege against self-incrimination as against a governmental inquiry of what he personally might have done with the documents to make them no longer available. In contrast, in the *Meeks* case the only claim of privilege was the claim made when Meeks was asked to explain what happened to the documents. Meeks never claimed the privilege against the obligation to supply business documents but only against an inquiry as to his personal role with respect to unavailability of the documents.

Further, in *Meeks* it is claimed that as in *Hankins* there is no proof to show that Meeks could not at the time of the show cause hearing produce the documents be-

cause his submitted statement to this effect was not accepted. But we also have the testimony of IRS agent Rodriguez that Meeks told him in the official meeting on September 13, 1979, that Meeks could not produce the documents.

Third, contrary to *Hankins*, there was no specific finding by the court before the claim of privilege that at the time of the show cause order he could produce the documents.

Strong support for the position of Meeks in this appeal is found in *Curcio v. United States*, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957). In that case the Supreme Court reversed a criminal contempt conviction of an individual for invoking the privilege against self-incrimination in refusing to testify as to the whereabouts of corporate records which he had been ordered to produce. The Court in *Hankins* distinguished *Curcio* on the ground that *Curcio* did not involve a refusal to testify at a contempt proceeding. Further, *Hankins* can be distinguished because Hankins never made clear that his claim of privilege was directed solely against explaining what role he might have played in the fact that records were no longer available rather than a general claim that the records within themselves might incriminate him.

Meeks had a sound reason to decline to offer more than sworn testimony that he did not then have the records and to claim the privilege rather than be forced to explain what might have happened to the records. His was a valid fear that he would be waiving his privilege if he testified that he did not have the records. His concern was confirmed in the third *Hankins* case in this Court, *Hankins v. Civiletti*, 614 F.2d 953 (5th Cir. 1980). In a habeas corpus proceeding, Hankins had submitted affidavits in the district court asserting his inability to comply with the production order. The Court rejected these affidavits. He then took the stand at the habeas corpus hearing and testified he had complied to the full extent of his current and future abilities. Upon cross-examination he then refused on the grounds of the claim of privi-

lege against self-incrimination to explain what he knew about the missing papers.

In its per curiam opinion this Court concluded, "Clearly, Hankins has waived his fifth amendment privilege with regard to matters relevant to his direct testimony." *Hankins v. Civiletti, supra* at p. 955. This holding stands firmly for the proposition that if Meeks had testified that he could not produce the records, he would have waived the claim of privilege as to any possible role he might have played in making it impossible to produce them.

The position of the government in this case pushes Meeks into an untenable position. If he does not explain what happened to the records, he must remain in prison. The only key to his release is his explanation. This is the thrust of the civil contempt order. The only way he can be released from prison would be for him to yield his constitutional privilege against self-incrimination.

Stated in terms of the common explanation of civil contempt, the person who is in custody must have the "key to the jail" in his pocket. He must be free to release himself from confinement by complying with the order of the Court. But the only way that Meeks can comply with the order of the Court in this case is to sacrifice a personal constitutional right. The civil contempt order forces Meeks to remain in jail until he testifies against himself as to matters which might tend to incriminate. This is in direct and specific contravention of the fifth amendment privilege. As the Supreme Court said in *Ullmann v. United States*, 350 U.S. 422, 76 S.Ct. 497, 100 L.Ed. 511 (1956): "[T]he sole concern (of the privilege) is, as its name indicates, with the

danger to a witness forced to give testimony leading to the infliction of penalties affixed to the criminal acts." *Id.* at 438, 76 S.Ct. at 506. *See also* the reversal of the civil contempt order for refusing to give testimony in *Malloy v. Hogan*, 378 U.S. 1, 84 S.Ct. 1489, 12 L.Ed.2d 653 (1964).

■ Since Meeks could not comply with the court order without sacrificing his properly asserted constitutional right, this Court directed that the civil contempt order be vacated. As we pointed out in our brief opinion on February 10, 1981, the vacating of this order does not bar proceedings undertaken to determine if appellant should be adjudged guilty of criminal contempt and confined for a fixed term for failure to obey the order of the court to produce the records. But a conviction of criminal contempt could not be grounded upon an assertion of the privilege against self-incrimination by Meeks when asked to explain why he cannot now produce such records. *Curcio v. United States*, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957).

This opinion is filed in support of the decision of this Court of February 10, 1981, vacating the order of confinement of George W. Meeks for civil contempt. Judge Reavley dissented from that decision and dissents from this opinion.

REAVLEY, Circuit Judge, dissenting:

George Meeks, as president of the St. George Company,[1] was served an IRS summons on June 12, 1979, directing him to appear before an IRS agent and give testimony relating to the tax liability of that corporation and to produce its books and records.[2] In response to the summons,

---

1. The St. George Company, Inc., which was engaged in the auto parts business in San Antonio, Texas, received a certificate of involuntary dissolution from the Texas Secretary of State in March of 1979. That same month, Meeks as president of the St. George Company was notified by letter that the IRS intended to audit the corporate tax return of the St. George Company.

2. The summons specifically sought the following books, records, papers and other data of

the St. George Company for the fiscal years ending on June 30, 1977 and June 30, 1978:

(1) Corporate minute book;

(2) Any and all books and records and statements concerning corporation assets and liabilities;

(3) Any and all books and records and invoices concerning corporation income and expenses;

(4) All bank statements, cancelled checks and deposit slips from July 1, 1976 through August 31, 1978;

Meeks appeared in person before two revenue agents on June 22, 1979. He brought with him a number of his corporate records, but would not allow the two agents to examine them unless he, individually, was granted transactional immunity from prosecution.

During the course of the meeting, Meeks commented to the agents that he interpreted the summons to mean that the IRS wanted to see all of the corporate records that existed for the time specified. The agents agreed with this assessment. Thereafter, Meeks indicated that he attempted to bring with him the books and records of the corporation identified in the summons, that he had access to a great many corporate records, that there were "boxes and boxes" of records, and that some of the corporate records requested existed in a computer.[3]

The corporate minute book was the only record requested in the summons that Meeks indicated he did not have in his possession. However, Meeks' answer clearly implied that a corporate minute book did exist.[4] Moreover, Meeks' response that he did not have the minute book in his "possession" is ambiguous since it is not clear whether he did not have it and did not know where it was or who possessed it, or whether he did not have it and could not legally acquire it.[5] Because the agents would not grant him transactional immunity,[6] Meeks, relying on the fourth and fifth amendments, refused to permit them to inspect the records he brought to the meeting.

Thereafter, the IRS sought enforcement of the summons. On August 21, 1979, the district court ordered Meeks to appear be-

---

(5) All savings account statements and passbooks from July 1, 1976 through August 31, 1978; and

(6) Any and all payroll records of salaries or wages paid to officers or employees including cancelled checks and bank statements.

3. The June 27, 1979 meeting was tape recorded and later transcribed. The transcription of this meeting was introduced as an exhibit in the show cause hearing on the IRS' petition to enforce the summons. The exhibit reflects that Meeks, in the June 27 meeting, stated:

ROBINSON: Do you have the books and records of the corporation with you?

MEEKS: I have endeavored to bring with me to the best of my ability the books and records of the corporation that you so identified, however, I think you would admit and recognize that it would be next to impossible to bring every piece of paper that applies to that corporation, to gather it all together in one place and haul it anywhere, it would constitute boxes and boxes of pieces of paper and the physical problem in so doing is rather large. There is also the fact that some of those corporate records exist in a computer and I can't very well pick the computer up and bring it down here to your office either. Or some of them may exist in the computer.

ROBINSON: Mr. MEEKS have you brought any of your records with you?

MEEKS: I have brought a number of my records with me, yes.

ROBINSON: Would you care to allow us to examine them at this time.

MEEKS: I don't believe I can give you just free access to those records under the circumstances, ah you have previously told

me that you will not assist me in protecting my rights.

ROBINSON: I haven't said I would assist you individually in any way.

MEEKS: I know, you said that you will not—

ROBINSON: You're not involved as an individual here at this point.

4. The transcription of the June twenty-seventh meeting shows the following verbal exchange with respect to the corporate minute book:

ROBINSON: Well Mr. MEEKS, are you prepared to allow us to examine the Corporation minute book at this time?

MEEKS: Ah, I would be more than happy to do so but I do not have the corporate minute book.

ROBINSON: Do you say you don't have it with you or you don't have one?

MEEKS: I do not have it with me because it is not in my possession.

5. The record reflects that Meeks was both president and treasurer of the St. George Company and that a Ricky Dermody held the positions of vice-president and secretary. Tex.Bus. Corp.Act Ann. art. 2.44 requires each corporation to "keep correct and complete books and records of account and [to] keep minutes of the proceedings of its shareholders and board of directors . . . ." Therefore, it is entirely consistent with Meeks' statement—that the corporate minute book was not in his possession—that the minute book was in Dermody's possession as secretary of the corporation.

6. The revenue agents informed Meeks they had no authority to grant his request for transactional immunity.

fore the IRS and give testimony regarding the corporation's tax liability and produce the requested records. On September 13, 1979, Meeks appeared before an IRS agent and produced a few documents, some of which were already in the possession of the IRS.[7] Regarding the other records and data specified in the summons, Meeks stated that the majority of the records requested were not in his possession. When questioned as to who had possession of the elusive records so a summons could be issued for them, Meeks again replied that he did not have them, nor could he locate them, and then he claimed his fifth amendment privilege against self-incrimination. When questioned about the corporation's bank records (statements, cancelled checks, and deposit slips), Meeks claimed he did not have any and could not remember at which bank in San Antonio the corporation kept its account during the fiscal years in question.[8]

Later during that September 13 interview, Meeks indicated that some of the records sought by the IRS were entered into a computer and stored on diskettes. According to Meeks, considerable amounts of data were lost from this computer operation and that data was not available to him.[9] Nonetheless, Meeks unequivocally indicated that it might be possible to obtain some or all of the data sought if he could prevent the IRS from conducting a "fishing expedition" by having the agents tell him specifically what information they wanted.[10] The reasonable inference from this

7. At the September 13 meeting, Meeks produced sixteen statements from two different auto parts suppliers. Meeks also produced three 941 forms (employer's quarterly tax returns) covering the fourth quarter of 1976 and the first and second quarters of 1977.

8. Meeks' memory had substantially improved by November 10, 1980, when a hearing was held to show cause for him not being held in contempt. Although not under oath, but while representing himself *pro se*, Meeks informed the district judge that the St. George Company had done its banking at the Kelly Field National Bank in San Antonio.

9. After problems with this computer system, Meeks' company switched to another computer system which uses a hard disk pack to store data. It is not clear from a reading of the record whether the new computer system was instituted before the St. George Company received the certificate of involuntary dissolution. Also, even if the new computer system was installed after the St. George Company ceased to exist, it is not inconceivable that data relevant to the corporation would be stored in the new system since Meeks continued to operate the auto parts business as a sole proprietorship after the involuntary dissolution of the corporation. During the September thirteenth meeting, Meeks only indicated that data from the old computer system was not available to him because the data storing diskettes (floppy disks) of the old computer were not interchangeable with the hard disk pack of the new computer. The inference from Meeks' statements is that the old diskettes still existed. Thus if these diskettes were produced by Meeks, the IRS could have retrieved the sought-after data by locating a comparable computer system.

10. The transcript of the meeting on September 13, 1979 reads, in pertinent part, as follows:

MR. MEEKS: At approximately the same time that we initiated the corporation, we endeavored to go on a computer operation. I had never dealt with computers before in my life. Some of the records that you seek were entered into the computer, and the hard copies destroyed. I assume destroyed. The hard copies can no longer be found. We spent a year fighting with the computer. We subsequently had to get a different computer because of problems with it.

MR. RODRIGUEZ: What information—

MR. MEEKS: And much of the data that you want just doesn't—I—I cannot produce.

MR. RODRIGUEZ: What information was entered into the computer, and what type of system is it? Is it tapes, or cards, or—

MR. MEEKS: Well, is [sic] and was—the operation that we have now is on a disc [sic] pack. That is not the computer that we had then. That's not the computer that we had the problems with, that we were losing considerable amounts of data from, that we were having considerable programming problem with.

MR. AREVALO: Is that your computer, or do you all buy time, or—

MR. MEEKS: It is an in-house unit, but it is leased.

MR. AREVALO: Okay.

MR. RODRIGUEZ: And you are saying, then, that the—the data from that computer is not available to you?

MR. MEEKS: No, it is not. The records in that computer were kept on what are generally referred to as floppy discs [sic], or discettes [sic]. The computer operation that we have now, runs on a hard disc [sic]

statement is that Meeks did possess, or had access to, some documents and records from which he could obtain or reconstruct the items and information sought by the IRS.

On September 17, 1979, Meeks filed a motion to be excused from complying with the district court's enforcement order, alleging that he had fully complied with the order and had "produced all documents and records in his possession or control *which are necessary to enable a representative of the IRS to complete his federal tax returns . . . .*" (Emphasis added.) A hearing was held on October 30, 1979, for Meeks to show cause why he should not be compelled to produce the requested records and documents. After hearing the evidence, the district court entered an order requiring Meeks to produce the requested records and documents.

On November 13, 1979, Meeks filed a notice of appeal from the district court's enforcement order of October 30, 1979. This court dismissed the appeal for want of prosecution on March 11, 1980, because of Meeks' failure to file a brief. The district court subsequently entered an order on August 28, 1980, requiring Meeks to produce the requested documents and records on October 6, 1980. On that date, Meeks appeared before an IRS agent, but did not produce the records specified in the summons. At that meeting, Meeks did agree to provide certain waivers which would allow the IRS to secure certain bank records. However, when the waivers were mailed back to the IRS by Meeks, the beginning and ending dates were altered so as to make the waivers unacceptable to the IRS.[11]

pack, and does have a little tape cassette thing. The old computer had neither the tape cassette, nor the hard disc [sic].

MR. RODRIGUEZ: Uh-huh.

MR. MEEKS: And—

MR. AREVALO: What happened with the print-outs?

MR. MEEKS: What few print-outs there are, or were, have nothing to do with the records that you—that you wish to see.

MR. RODRIGUEZ: Well, we asked for all records concerning the corporation's assets, liabilities, incomes, and expenses. That pretty well covers—

MR. MEEKS: Well, I don't think a price list would have to do with an asset, or liability. It's just a list of prices of merchandise, whether the merchandise is there or not. This is the kind of thing that—

MR. RODRIGUEZ: What about inventory?

MR. MEEKS: Inventories were—for some considerable period, were done partially by hand, partially by the computer. It was my intention, when we got the computer, to have it take care of all of that. It didn't work; didn't work at all.

MR. RODRIGUEZ: So then—

MR. MEEKS: I—

MR. RODRIGUEZ: —what information—

MR. MEEKS: I spent—well, never mind. You don't need—you're not interested in that.

MR. RODRIGUEZ: What information is on the computer, though? Income and expenses?

MR. MEEKS: I've avoided bringing something else up here that perhaps I really should. What you're asking me for here is for every piece of data that concerns the company for the time period involved, every invoice, every statement, every—

MR. RODRIGUEZ: That's covered by the summons.

MR. MEEKS: Every piece of paper that exists. And you're now also asking me for every piece of data that might have existed in the computer.

MR. RODRIGUEZ: I'm asking you for the books and records of the corporation.

MR. MEEKS: This—

MR. RODRIGUEZ: And if they are on a computer, and I'd like to see the print-out, then.

MR. MEEKS: Well, the print-outs don't exist. This makes very much of a fishing expedition. If you would tell me, sir, specifically what information you want—

MR. RODRIGUEZ: I want the general—

MR. MEEKS: —it is possible that some or all of that data might be obtainable.

MR. RODRIGUEZ: Uh-huh.

MR. MEEKS: Or maybe even could be reconstructed. I don't know, because I don't know what you want.

MR. RODRIGUEZ: I want the—

MR. MEEKS: You asked for—

MR. RODRIGUEZ: It's outlined in the summons. I want the books of—of the corporation concerning the assets and liabilities. I want the books concerning income. I want the books concerning expenses.

11. The record shows that Meeks changed the beginning date on the waivers from July 1, 1976 to August 1, 1976, and that he changed the ending date on the waivers from August 31, 1978 to June 30, 1977. In its summons the IRS sought bank records of the St. George Compa-

On November 25, 1980, a hearing was held for Meeks to show cause why he should not be held in contempt for failure to obey the court's enforcement order. Meeks refused to testify in his own behalf to explain the whereabouts of the requested records and documents or answer any questions under oath concerning them on the ground that such testimony might tend to incriminate him. However, Meeks did submit a written declaration to the effect that he did not "have in [his] possession or control any of the books, records, or papers of the St. George Company which are called for in the summons and court order . . . ."[12] Meeks appeals the district court's order adjudging him in civil contempt.

The majority opinion rightly states that a person held in civil contempt must carry "the 'key to the jail' in his pocket," that is, he must be able to release himself from confinement by complying with the court's order. *See Maggio v. Zeitz*, 333 U.S. 56, 68, 68 S.Ct. 401, 407, 92 L.Ed. 476 (1948). I dissent from the court's decision in this case because the majority erroneously concludes "the only way that Meeks can comply with the order of the Court in this case is to sacrifice a personal constitutional right [*i. e.* his right to be free from compelled self-incrimination]." 642 F.2d at 736.

Meeks is being held in contempt by the district court for his failure to produce documents and records, not for refusing to testify. He can comply with the court's order either by producing the requested documents and records or by establishing his present inability to comply.[13] Hence, the majority fails to consider that Meeks can comply with the court's order by producing the documents and records. This bespeaks the infirm foundation of the majority opinion, which is the assumption, unsupported by a review of the entire evidence, that Meeks no longer possessed, or had control over, the documents and records sought.[14]

The majority never really addresses the pivotal issue of this case, which is whether the district court was "clearly erroneous" in finding that the documents and records sought exist or were in existence when the summons was issued. The majority does not expressly conclude that the district court's finding regarding Meeks' ability to comply with the order is clearly erroneous. Instead, the majority notes that there is "some evidence in the record" to justify a finding that the documents and records existed when the summons was issued. Then my brethren comment that as to the evidence that the documents and records did *not* exist when Meeks was sentenced to civil contempt, he has said over and over again that they do not exist, and his declaration, to which he would have sworn, indicated

---

ny for the fiscal years ending June 30, 1977 and June 30, 1978. The IRS required an ending date on the waivers two months past the end of the fiscal year in order to pick up any items from the 1977-78 fiscal year that had not cleared by June 30, 1978.

**12.** This statement is blatantly false at least because of the fact that Meeks is in *control* of bank records of the St. George Company for the fiscal year ending June 30, 1978, and has not given a waiver for the bank, at which the corporation had an account, to release its records to the IRS relative to the corporation for the 1977-78 fiscal year.

**13.** It may well be possible for Meeks to establish his present inability to comply, if indeed that is the case, by evidence other than his own testimony. This possibility goes ignored by the majority and apparently unexplored by Meeks in the proceedings below. If Meeks is indeed unable to comply, and had he been represented by counsel below, such counsel may well have

been able to establish Meeks' inability to comply without his testimony.

**14.** The majority's assumption that Meeks cannot comply with the district court's order also ignores the record. In the September 13, 1979 meeting, Meeks claimed he could not remember at which bank the St. George Company had an account. Well over a year later, Meeks did remember the name of the bank and supplied the IRS with a waiver to permit the bank to release copies of the corporation's statements, cancelled checks and deposit slips dating from August 1, 1976 to June 30, 1977 to the IRS. Therefore, even assuming *arguendo* that the majority's assumption is otherwise correct, Meeks obviously could partially comply with the summons and order by furnishing the IRS with the bank records for the fiscal year ending on June 30, 1978. *See* footnotes 11 & 12, *supra*.

this. Finally, as additional "evidence" that the documents and records did not exist, the majority observes that in his talk with the revenue agent on September 13, 1979, Meeks stated "the documents were not in existence or at least were not in his possession and that he could not locate them." 642 F.2d at 735.

On reviewing the entire evidence, I am not left with a "definite and firm conviction that a mistake has been committed," *B. H. Bunn Co. v. AAA Replacement Parts Co.,* 451 F.2d 1254, 1260 (5th Cir. 1971), and I, therefore, cannot conclude that the district court's finding regarding the existence of the documents and records is clearly erroneous. *See* Fed.R.Civ.P. 52(a).

Prior to the district court's enforcement order of October 30, 1979, compelling Meeks to produce the documents and records outlined in the summons, Meeks had filed a motion to be excused from complying with the summons and previous court order requiring production of the documents and records on the ground that he had already complied with the order by producing all such documents and records in his possession. When the district court entered its enforcement order on October 30, it expressly overruled Meeks' motion to be excused from compliance. Hence, the order of October 30, 1979 contains an implicit finding of fact concerning Meeks' ability to comply with the court's order, *i. e.* that the records sought in the summons existed and that Meeks had access to or was in possession of them.[15]

This order, entered on October 30, 1979, along with its implicit finding that Meeks had the ability to comply, became final and unreviewable when this court dismissed the appeal of that order for want of prosecu-tion. Therefore, when Meeks appeared on November 25, 1980, at the hearing to show cause why he should not be held in contempt for non-compliance with the renewal of the court's order compelling production of the documents and records, he was confronted by a prima facie case that such documents and records continued to exist and remained in his possession or control. *See Maggio v. Zeitz,* 333 U.S. 56, 75, 68 S.Ct. 401, 411, 92 L.Ed. 476 (1948). This is so because Meeks cannot now, on appeal from a civil contempt adjudication, attack the original production order since it is res judicata on the issue of his possession of the documents and records at the time it was issued. *Id.; United States v. Hankins,* 581 F.2d 431, 437 n.8 (5th Cir. 1978), *cert. denied,* 440 U.S. 909, 99 S.Ct. 1218, 59 L.Ed.2d 457 (1979).

Once an order establishes prior possession, the reasonable inference with respect to books and records is the continuance thereof. *Maggio,* 333 U.S. at 65–66, 75, 68 S.Ct. at 406, 411. Thus although Meeks could not challenge, at the civil contempt show cause hearing, the previous adjudication of possession, he was not prevented from establishing his lack of present possession of the items enumerated in the court's order. As noted by the Supreme Court in *Maggio,* if the potential contemnor offers no evidence as to his inability to comply with the court's order, or stands mute,[16] he does not meet the issue of establishing his lack of present possession to overcome the prima facie case. 333 U.S. at 75, 68 S.Ct. at 411. "Nor does he do so by evidence or by his own denials which the court finds incredible in context." *Id.* at 75–76, 68 S.Ct. at 411.

---

**15.** *See, e. g., Clinkenbeard v. Central Southwest Oil Corp.,* 526 F.2d 649, 650–51 (5th Cir. 1976) (appellate court implied finding of fact on part of district court that must necessarily have been made by the lower court to support its judgment).

**16.** The concealment of assets in any bankruptcy proceeding or the destruction of records or documents pertaining to the bankrupt is a crime punishable by up to five years imprison-ment and/or a fine up to $5,000. 18 U.S.C. § 152. In *Maggio,* the Supreme Court of the United States did not seem to be concerned that a bankrupt in a civil contempt proceeding, confronted by a turnover order establishing prior possession, might stand mute, relying on his *fifth amendment privilege of self-incrimination,* and yet be held in contempt for his failure to establish lack of present ability to comply.

At the hearing to show cause why he should not be held in contempt, Meeks failed to introduce any evidence that the records no longer existed or that he did not presently possess or have access to them. Meeks' uncross-examined declaration is not "evidence." Even considering the record of the October 30, 1979 final order compelling production of the items sought, there is a lack of proof to show Meeks' inability to comply. The majority bases its unarticulated holding that the district court was clearly erroneous in its finding as to the existence of the records [17] on the allegations in Meeks' unsworn motion to excuse himself from compliance and on Meeks' self-serving statements to the revenue agent in the September 13, 1979 meeting that he did not have the requested documents and records. The only real "evidence" consists of Meeks' statements to the revenue agent.[18] In making its credibility choice, the district court was entitled to discount these self-serving statements, especially in view of Meeks' contradictory statements during the same meeting that it might be possible for him to obtain some or all of the data sought by the IRS if he could prevent the agents from conducting a "fishing expedition."

If the majority's decision is left to stand, it will enable any individual to defy a court order enforcing an IRS summons to produce documents, so long as he or she claims (by "declaration") a lack of possession or their present nonexistence and then asserts his or her privilege against self-incrimination. The district court is then left only a criminal contempt sanction with which it can enforce its order.[19] Moreover, the majority's decision will permit any party to a civil action to defy a court's order under Fed.R. Civ.P. 37(a)(2) to produce documents for inspection by claiming inability to comply and asserting the fifth amendment privilege against self-incrimination,[20] without fear of the sanction of being held in civil contempt. See Fed.R.Civ.P. 37(b)(2)(D).

The majority finds strong support in *Curcio v. United States*, 354 U.S. 118, 77 S.Ct. 1145, 1 L.Ed.2d 1225 (1957), for the position taken by Meeks in this appeal. I find no support for Meeks' position in the *Curcio* decision because it is inapposite to this case. *Curcio* involved a criminal contempt conviction of a contemnor who was subpoenaed to appear before a grand duty and to give testimony and produce documents. The contemnor appeared but failed to produce the demanded books and records. He did testify that the demanded books and records were not in his possession, but "refused on the ground of self-incrimination, to answer any questions pertaining to the whereabouts, or who had possession, of the books and records he had been ordered to produce." 354 U.S. at 119, 77 S.Ct. at 1147. It was this refusal to testify concerning the

---

**17.** Implicit in the district court's finding that the documents and records exist, or were in existence at the time when the summons was issued, is the finding that Meeks had possession or control of them. *See, e. g., Clinkenbeard v. Central Southwest Oil Corp.*, 526 F.2d at 650–51 (implying a finding of fact on the part of the district court that must necessarily have been made by the court to support its judgment); *Gilbert v. Sterrett*, 509 F.2d 1389, 1393 (5th Cir.), *cert. denied*, 423 U.S. 951, 96 S.Ct. 373, 46 L.Ed.2d 288 (1975) (the district court's findings of fact "should be construed liberally and found to be in consonance with the judgment, so long as that judgment is supported by evidence in the record"); *Rayonier, Inc. v. Polson*, 400 F.2d 909, 923 (9th Cir. 1968) (it is not necessary for a district court to make findings asserting the negative of each issue of fact raised; it is sufficient if the affirmative facts found by the court, construed as a whole, negative each requested contention).

**18.** These statements by Meeks that he did not have the requested books and records, which are contained in the transcript of the September 13, 1979 meeting and which were offered by the Government as admissions of a party opponent, Fed.R.Evid. 801(d)(2), to the extent they give aid to the majority's conclusion, could have been rejected with the credibility of Meeks by the trial court, within whose province the making of credibility choices lies.

**19.** The penalty for a criminal contempt is six months in jail and/or a fine of $1,000. 18 U.S.C. § 402.

**20.** A party who either destroyed or secreted documents subject to a production order under Fed.R.Civ.P. 37(a)(2) would be guilty of obstructing justice, which is punishable by up to five years imprisonment or a fine of not more than $5,000, or both. 18 U.S.C. § 1503.

whereabouts of the documents for which contemnor was adjudged guilty of criminal contempt by the district court.

The Supreme Court in *Curcio* held that the contemnor, who as the custodian of a labor organization's books and records, could not be punished for invoking his fifth amendment privilege against self-incrimination. The court reasoned that, although the contemnor was not entitled to the privilege with respect to production of the records themselves, he was entitled to the privilege when questioned regarding their whereabouts. This is so because contemnor "might be compelled to convict himself out of his own mouth."[21] 354 U.S. at 128, 77 S.Ct. at 1151–1152.

In this case, Meeks was not adjudged to be in contempt for a failure to answer questions concerning the whereabouts of the records sought by the summons. Instead, he was held in contempt for his failure to produce those records. The Supreme Court impliedly approved such a measure in *Curcio*, when it noted that the petitioner therein "might have been proceeded against for his failure to produce the records demanded by the subpoena *duces tecum*." 354 U.S. at 127 n.7, 77 S.Ct. at 1151 n.7. *Wilson v. United States*, 221 U.S. 361, 31 S.Ct. 538, 55 L.Ed. 571 (1911), which involved the commitment of a custodian of corporate records for civil contempt until he purged himself by producing the subpoenaed records, was cited by the Court in *Curcio* for its conclusion that the contemnor could have been proceeded against for failing to produce the records, although not for his refusal to testify concerning their whereabouts.

I conclude that this case is controlled by the decision of this circuit in *United States v. Hankins*, 565 F.2d 1344, 1351–52 (5th Cir.), *aff'd on rehearing with additional reasons stated*, 581 F.2d 431, 437 (5th Cir. 1978). "With the fact of non-compliance with the court's previous order clearly and convincingly established, [Meeks'] failure to testify, . . . resting on his Fifth Amendment right not to testify, means that he has failed to show cause why he should not be held in contempt of an outstanding order." 581 F.2d at 437. However, I do recognize that Meeks' commitment for civil contempt would not be indefinite if, as he alleges, he is now truly unable to comply with the court's order to produce the documents and records. As the Supreme Court remarked in *Maggio*:

> "[T]he [contemnor] may be permitted to deny his present possession and to give any evidence of present conditions or intervening events which corroborate him. The credibility of his denial is to be weighed in the light of his present circumstances. *It is everywhere admitted that even if he is committed, he will not be held in jail forever if he does not comply. His denial of possession is given credit after demonstration that a period in prison does not produce the [documents].* The fact that he has been under the shadow of prison gates may be enough, coupled with his denial and the type of evidence above, to convince a court that his is not a willful disobedience which will yield to coercion."

333 U.S. at 76, 68 S.Ct. at 411 (emphasis added).

I would affirm the order of the district court.

---

**21.** When it stated that the petitioner in *Curcio* "might be compelled to convict himself out of his own mouth," the Supreme Court meant that if he was compelled to testify regarding the whereabouts of the union's records, he might convict himself of obstructing justice and racketeering. 354 U.S. at 121 n.2, 77 S.Ct. at 1148 n.2. *See also* 18 U.S.C. §§ 1503 and 1951.